**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
OCEANA, INC.,                               )
                                            )
          Plaintiff,                 )
                                            )
          v.                         )    **Civil Action No. 04-810 (ESH)**
                                            )
DONALD L. EVANS, *et al.*,                  )
                                            )
          Defendants.                )
_____)


## MEMORANDUM OPINION

Plaintiff challenges the Secretary of Commerce's approval of Amendment 10 to the

Atlantic Sea Scallop Fishery Management Plan ("FMP" or "Scallop FMP"), a long-term program

to manage the sea scallop fishery through rotational closures and other measures, and Framework

16, a set of regulations authorized by Amendment 10.  Plaintiff alleges that in approving these

measures, the Secretary has failed to protect loggerhead sea turtles under the Endangered Species

Act ("ESA"), 16 U.S.C. § 1531 *et seq.*; to establish an adequate system for observing and

reporting bycatch under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*; and to

consider the reasonable alternatives proposed by plaintiff to protect essential fish habitat ("EFH")

from the destructive effects of scallop dredges under the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 *et seq.*, the MSA, and the Administrative Procedure Act ("APA"), 5

U.S.C. § 706 *et seq.*  Plaintiff also claims that Amendment 10 defers key decisions about fishery

management in contravention of the MSA by establishing a "framework adjustment" procedure

for future management measures.  Plaintiff has moved for summary judgment and asks the Court

to declare the agency actions unlawful, remand them to the agency to cure by a date certain, and

enjoin the scallop fishery from operating in Mid-Atlantic waters through November.  The

Fisheries Survival Fund ("FSF") has intervened as a defendant on behalf of the scallop fishery.

The Court, having considered the voluminous administrative record, the parties'

pleadings, and the arguments of counsel at the June 30, 2005 hearing, concludes that plaintiff's

motion for summary judgment must be granted in part and denied in part, and that its motion for

a permanent injunction must be denied.

## BACKGROUND

The scallop fishery is one of the country's most valuable fisheries and occurs mainly in

the Gulf of Maine, Georges Bank, and the Mid-Atlantic.  (BO AR at 235.)[1]  Pursuant to its

obligations under the MSA, the New England Fisheries Management Council ("the Council")

began developing Amendment 10 to the Scallop FMP in 2000.[2]  The scallop fishery had been a

limited access fishery since Amendment 4 was developed and implemented in 1994.  (*Id.* at 236.)

---

[1]The Administrative Record consists of the Amendment 10 record ("AR"), the supplemental Biological Opinion record ("BO AR"), reference documents produced with the BO AR ("BO AR RefDoc") and the supplemental Framework 16 record ("FW16 AR").  The AR and FW16 AR each consists of hundreds of separately paginated documents, whereas the BO AR is paginated as one document.  The Biological Opinion ("BO") itself is at pages 227-325 of this document.

[2]As described more fully in *Oceana v. Evans*, No. 04-811, 2005 WL 555146 (D.D.C. Mar. 9, 2005) (hereinafter "*Oceana I*"), *appeals pending*, Nos. 05-5176, 05-5177, 05-5178 (D.C. Cir.), the MSA, as subsequently amended by Congress in 1990 and 1996, aims to conserve and manage fishery resources.  It does so in part by providing for the creation of FMPs by eight Regional Fishery Management Councils.  The Council has authority over fisheries in the Atlantic Ocean, seaward of the New England states, including the scallop fishery.  *Id.* § 1852(a)(1)(A). The Secretary of Commerce is ultimately responsible for approving each FMP, though in practice he has delegated his authority to the National Marine Fisheries Service ("NMFS").  *See C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1558 (D.C. Cir. 1991).

Whereas the old FMP provided for annual days-at-sea ("DAS") allocations for vessels to fish anywhere in the Exclusive Economic Zone ("EEZ")[3/] and allowed the Council to close and reopen certain areas to scallop vessels on an *ad hoc* basis, Amendment 10 introduced a formal rotational closure system to "focus fishing effort on larger, more valuable scallops in area[s] where the effort is more efficient."  (AR Doc. 138 (Amendment 10 and Final Environmental Impact Statement ("EIS")) at C1193.)  The rotation program is based on changing conditions of the scallop resource and aims to "postpon[e] mortality on small scallops [. . . ,] improv[e] yield, and reduc[e] total fishing time to achieve the fishing mortality targets."  *Id.*  The Council also developed Amendment 10 to bring the FMP into compliance with the MSA's mandate to minimize adverse effects on EFH to the extent practicable and with a court order to complete a more thorough NEPA analysis of alternatives to minimize the adverse impact of scallop dredge and trawl gear on EFH.  *See Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000) (hereinafter "*AOC*").  Amendment 10 also, *inter alia*, modified the procedure by which the Council could propose changes to the management measures through "framework adjustments."  (*See* AR Doc. 138 at C1196-99.)

The Council completed a Final EIS for Amendment 10 on December 19, 2003, and NMFS promulgated a final rule on June 23, 2004.  69 Fed. Reg. 35194 (*reproduced at* AR Doc. 1329).  The final rule incorporates by reference the December 19, 2003 document, which includes both the Council's description of Amendment 10's provisions and the EIS.  (*See* AR Doc. 138.)

---

[3/]The EEZ extends seaward from the boundary of the states' territorial sea to a distance of 200 nautical miles.

During the approximately four years of Amendment 10's development, NMFS implemented several interim framework adjustments. These measures opened up previously closed juvenile cod EFH to scallop dredging during the 2000 season (Frameworks 12 and 13), created a controlled-access program for areas of the fishery in the Mid-Atlantic for the 2000 and 2001 seasons (Framework 14), and continued Framework 14's measures for the 2003 season (Framework 15). All of these frameworks provoked legal challenges-- particularly with respect to EFH and protection of sea turtles-- by Oceana or its predecessor organization, American Oceans Campaign. *See Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001); *Conservation Law Found. v. United States Dep't of Commerce*, 229 F. Supp. 2d 29 (D. Mass. 2002) (hereinafter "*CLF I*"); *Conservation Law Found. v. Evans*, 306 F.3d 21 (1st Cir. 2004) (hereinafter "*CLF II*"); *Oceana v. Evans*, 2004 WL 1730340 (D. Mass July 30, 2003). Courts have consistently rejected these challenges, in part because of the temporary nature of framework actions and the anticipated enactment of Amendment 10. (*See* Pl.'s Mot. for Summ. J. and Permanent Injunctive Relief ["Mot."] at 3-6.)

NMFS issued Framework 16 to the Scallop FMP jointly with Framework 39 to the Northeast Multispecies FMP ("Groundfish FMP") on November 2, 2004. 69 Fed. Reg. 63460 (*reproduced at* FW16 AR Doc. 306). The joint framework measure establishes the first rotational access areas for the new management program proposed by Amendment 10. Specifically, it allows scallop vessels to dredge for scallops in portions of the existing Georges Bank groundfish closed areas and allocates additional DAS for fishing in these areas. (BO AR at 230.) Framework 16 also revised the EFH closed areas implemented under Amendment 10 to

- 4 -

make them consistent with the EFH closures established under Amendment 13 to the Groundfish FMP.[4/]

Upon determining that reauthorization of the scallop fishery was likely to adversely affect threatened and endangered sea turtles, NMFS initiated formal consultation on December 21, 2001, as required by the ESA.  (*Id.* at 229.)  The ESA prohibits federal agencies from authorizing any action that is likely to "jeopardize"[5/] the continued existence of an endangered species.  16 U.S.C. 1536(a)(2).  If an action is "likely to adversely effect" an endangered species, the agency must undertake a formal "consultation" to evaluate the effects of the proposed action and determine whether the action will jeopardize the species.  50 C.F.R. § 402.14.  The consultation process results in the issuance of a BO.  *Id.*

On February 24, 2003, NFMS issued a BO which concluded that the continued operation of the scallop fishery would not result in jeopardy for loggerhead sea turtles or other ESA-listed species.  Based on new information on sea turtle takes[6/] and the proposal to modify the FMP through Amendment 10, the agency reinitiated consultation on November 21, 2003.  The resulting February 23, 2004 BO again concluded that, although the agency anticipated that the scallop fishery would result in the incidental take of 111 sea turtles annually, the continued

---

[4/]Amendment 13 was the subject of a challenge by plaintiff, Natural Resources Defense Council and Conservation Law Foundation in *Oceana I.*

[5/]"Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

[6/]To "take" a sea turtle under the ESA is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it. 16 U.S.C. § 1532(19).

authorization of the scallop fishery would not jeopardize the species' continued existence. (BO AR at 228-29.)  Plaintiff brought this case on May 18, 2004, and moved for a preliminary injunction of the scallop fishery on July 16, 2004, arguing that the February 2004 BO had underestimated the number of sea turtles that would be killed by scallop dredges.  The Court denied this request at a hearing on August 18, 2004.

The agency received a new estimate of the number of turtles trapped in scallop dredge gear on August 31, 2004, and concluded that this information warranted reinitiation of the consultation.  On December 15, 2004, NFMS issued a final "no jeopardy" opinion and authorized the incidental take of 752 loggerheads annually.  (BO AR at 304.)  This BO is the subject of plaintiff's instant ESA claims.

As each of plaintiff's four claims in its Motion for Summary Judgment has its own detailed statutory and factual background, the Court will defer further discussion of the relevant facts and law until it addresses each specific claim.

## ANALYSIS

### I.      Standard of Review

The Court reviews the Secretary's actions pursuant to the judicial review provisions of the APA.  The Court may set aside an administrative action only where it is arbitrary, capricious, or otherwise unlawful. *See* 5 U.S.C. § 706(2)(A)-(D); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989).  Administrative actions are presumed valid and are accorded great deference; thus, the inquiry is only whether the Secretary's decisions were unreasonable, and "this court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co.*, 931 F.2d at 1565.  This is particularly the case when the Court is

evaluating the Secretary's scientific determinations, as opposed to simple findings of fact.  *See*

*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  Moreover, the Court will not

lightly depart from regulations promulgated by an agency in order to achieve a statute's goals.

*See Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451-52 (D.C. Cir. 1988).

Thus, it is "especially appropriate for the Court to defer to the expertise and experience of those

individuals and entities -- the Secretary, the Councils, and their advisors -- whom the [MSA]

charges with making difficult policy judgments and choosing appropriate conservation and

management measures based on their evaluations of the relevant quantitative and qualitative

factors."  *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

In sum, although this Court undertakes a "searching and careful" examination, *Marsh*,

490 U.S. at 378, to determine whether there is a "rational connection between the facts found and

the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and it

will not accept a record based on "bare conclusory allegations of fact," *Taylor v. FDIC*, 132 F.3d

753, 762 (D.C. Cir. 1997), the Court may not substitute its judgment for that of the Secretary.

*See Marsh*, 490 U.S. at 378.

## II.    Biological Opinion

Scallop fishing gear-- consisting of large steel dredges and trawls that sweep along the

ocean floor-- harms loggerhead sea turtles and NMFS has estimated that up to 479 loggerheads

will be killed annually as a result of scallop fishing under Amendment 10 and Framework 16.

(BO AR at 304.)[7]  Loggerhead turtles, listed as "threatened" under the ESA, also face numerous

---

[7]Extrapolating from observed takes during the 2003 fishing year, NMFS anticipates that
up to 479 "lethal takes" will result from interactions with scallop dredge gear annually and that
scallop trawl gear will harm an additional three loggerheads "which may be alive or dead."  (BO

threats from other fisheries and human activities throughout their transoceanic range.  Plaintiff

alleges that NMFS's decision to nevertheless permit the continued authorization of the Mid-

Atlantic scallop fishery, without seasonal closures to protect sea turtles, was arbitrary, capricious,

and contrary to the ESA.

**A.    Background**

Section 7(a)(2) of the ESA requires that each federal agency "shall . . . insure that" any

action authorized, funded, or carried out by the agency is "not likely to jeopardize the continued

existence of any endangered or threatened species or result in the destruction or adverse

modification" of the species' critical habitat.  16 U.S.C. 1536(a)(2); *see also* 50 C.F.R. § 402.14.

If the proposed action is "likely to affect" an endangered species, the agency authorizing the

action must formally consult with either NMFS or the United States Fish and Wildlife Service

("FWS"), depending on the species.  *Id.*  The section 7 consultation process results in the

issuance of a BO that evaluates the status of the species and the effects of the proposed action,

and determines whether the action, "taken together with cumulative effects," is likely to

jeopardize a listed species.  50 C.F.R. § 402.14(g)(3)-(4).  In preparing a BO, NMFS must use

"the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

NMFS listed the loggerhead sea turtle as a threatened species under the ESA in 1978.[8]

The turtles commonly occur throughout the inner continental shelf from Florida to Cape Cod,

---

AR at 304.)  But, as noted in the BO, this is "likely a worst case scenario."  (*Id.* at 284.)
Although observer coverage has increased from 911 observer-days between March and October
of 2003 to 1,995 observer-days for the same time period in 2004, the actual (as opposed to
extrapolated) take has decreased from twenty-two in 2003 to nine in 2004.  (*See id.*)

[8]Although the BO addresses both loggerhead and leatherback sea turtles, plaintiff's
challenge concerns only loggerhead turtles.

Massachusetts.  (*Id.* at 244.)  Biologists believe there are at least five distinct subpopulations in

the western North Atlantic.[9/]  (*Id.* at 243.)  Threats to these populations include fisheries in state,

federal and international waters, poaching, development and erosion on nesting beaches, and

ingestion of marine debris, among others.  (*Id.* at 271.)  Some subpopulations appear to be

increasing, while nesting data suggests that the northern nesting population is "stable or

declining."  (AR Doc. 1459 at 43-44.)  According to a recent assessment, "further declines or

loss of the northern nesting population . . . could contribute to a serious population decline over

the entire region."  (AR Doc. 1435 at 31.)

    The primary type of gear used in the scallop fishery is dredge gear, a set of steel frames,

usually fifteen feet in length, which are towed along the sea floor.  The dredge fishery accounts

for ninety-five percent of scallop landings (*i.e.*, pounds of scallop meat).  Trawl gear (a cone-

shaped net equipped with steel weights, also towed along the seabed) accounts for most of the

remaining five percent of landings.[10/]  (BO AR at 237.)  Both types of gear can capture and kill

sea turtles.  Sea turtles can be injured or killed by forced submersion by the dredge or trawl,

being struck by the dredge, being crushed by large rocks that collect in the dredge bag, or falling

to the deck of the ship during the hauling of the dredge.[11/]  (*Id.* at 278-79.)

---

[9/]These are the northern nesting subpopulation, occurring from North Carolina to
northeast Florida; the South Florida nesting subpopulation, the Florida Panhandle nesting
subpopulation, the Yucatan nesting subpopulation, and the Dry Tortugas nesting subpopulation.
(BO AR at 243.)

[10/]Also for comparison, 302 limited access permits were issued to scallop vessels using
dredge gear in 2003, whereas 31 limited access permits were issued to scallop vessels using trawl
gear.  (*Id.* at 277.)

[11/]Given the migration patterns of loggerheads, scallop dredge and trawl gear is most
likely to harm the turtles between April and November.  (*Id.* at 283.)   Plaintiff focuses on the

NMFS conducted a series of intraagency consultations to determine whether the continued authorization of the scallop fishery under Amendment 10 was likely to jeopardize the continued existence of sea turtles.  The December 2004 BO predicted that 479 loggerheads would be killed annually by scallop gear based on an extrapolation of observed takes during 2003.  Based primarily on modeling conducted by NMFS's Southeast Fisheries Science Center ("SEFSC") in 2001 to assess the impact of shrimp-trawl Turtle Excluder Device ("TED") regulations on loggerhead populations (the "SEFSC 2001 model"), the agency concluded that this impact was unlikely to jeopardize the continued existence of the species.   (BO AR at 300.)

Plaintiff alleges that the BO "failed to articulate a rational basis for concluding that the Fisheries Service could insure that continued scallop fishing would not jeopardize loggerheads." (Third Am. Compl. ¶ 2.)  Although plaintiff levels a number of criticisms to support this claim, the June 30 hearing clarified that Oceana's primary concerns are threefold.  First, plaintiff argues that NMFS's use of the SEFSC 2001 model was so fraught with uncertainties that it was not rational to rely on it to justify a no-jeopardy conclusion.  Second, plaintiff claims that the agency's decision was not rational because the record does not support the agency's use of decades-old data, or, in the alternative, because the agency failed to consider data that contradicted one of its key assumptions.  Third, plaintiff contends that by defining the relevant "action area" and "environmental baseline" too narrowly, *see* 50 C.F.R. § 402.02, the agency has obscured the harmful effects of human activities outside the Mid-Atlantic fishery.  Notably,

---

period between June and November as the most important period for protecting loggerheads (Mot. at 2), presumably because that is the period when sea turtle capture has been observed. (*See* BO AR at 287.)

plaintiff does *not* claim that the agency could have relied on a superior model or more current

data and thereby failed to use the "best available science."  Acknowledging that "the agency can't

use information it doesn't have," Oceana instead argues that, "if it's going to rely on information

it has to articulate a basis for relying on that information . . . [a]nd if it's going to conclude and

ensure against jeopardy, that's a very strong conclusion and it has to have a strong basis for that."

(June 30, 2005 Hearing Tr. ["Tr."] at 10.)

> **B.     Analysis**

The Court reviews the BO under APA standards to determine whether it is "arbitrary,

capricious, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  *See Nat'l*

*Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 176 (D.D.C. 2004).  The relevant inquiry is

whether the agency has articulated "a rational connection between the facts found and the choice

made." *Baltimore Gas & Elec. Co.*, 462 U.S. at 88.   The Court must engage in a "thorough,

probing, in-depth review" to determine whether "the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment," but it may not substitute

its judgment for that of the agency.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 416 (1971).  Moreover, it must give special deference where the agency has relied on its

scientific expertise.  *See, e.g.*, *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C.

1997); *Nat'l Fisheries Inst.*, 732 F. Supp. at 223.

> **1.     SEFSC 2001 Model**

Plaintiff claims that the agency's use of the SEFSC 2001 model to analyze whether the

scallop fishery will jeopardize the loggerhead species constituted an "irrational[] rel[iance] on the

model to do something it is simply not built to do" (Mot. at 16-17), while defendants counter that

the model represented a reasoned methodology given the paucity of available data.

Plaintiff's argument with respect to the model is twofold.  The first issue is whether the
agency acted reasonably and in accordance with the ESA in the face of uncertainty, and the
second, related issue is whether the agency properly considered whether its assumptions had any
basis in the record and whether it articulated a reasoned basis for its conclusions.  Before
resolving these issues, the Court must first explain the details of the model.

The SEFSC 2001 model was originally developed by several sea turtle experts to help
determine how protection of turtles at different "life stages" would impact loggerhead population
growth.[12]  *See* S.S. Heppell *et al.*, *Population Models for Atlantic Loggerheads: Past, Present,
and Future*, *in* LOGGERHEAD SEA TURTLES 255-73 (Bolton and Witherington eds., 2003)
(*reproduced at* BO AR RefDoc 41).  Rather than quantitatively estimating the size of the
loggerhead population, the model indicates whether the population *trend* is declining, stable, or
increasing based on duration of life stages, survival rates at each stage, size at each stage,
population growth curves, sex ratios, age to maturity, and other data drawn from existing
literature.  (*See* AR Doc. 1435 at 14-25 (describing model in greater detail); *see also* Fed. Defs.'
Opp'n to Pl.'s Mot. ["Defs.' Opp'n"] at 14 and Def.-Intervenor FSF's Mem. of P. & A. in Opp'n
to Pl.'s Mot. ["FSF's Opp'n"] at 10-11 (acknowledging that the model is "qualitative").)
Significantly, the model uses mortality rates derived from data collected in the 1970s and 80s.

———————————

[12]For example, the paper setting forth the model explains that shrimp trawlers had argued
that conservation measures should be aimed at very young turtles at their nests rather than at
older turtles in the water.  Population modeling undermined this argument by showing that the
benefits from nest protection would not necessarily compensate for the mortalities to older turtles
resulting from shrimp trawl gear.  This finding provided support for regulations requiring shrimp
trawlers to install TEDs.  (BO AR RefDoc 41 at 259.)

(*See* AR Doc. 1435 at 19-20; AR Doc. 1400 at 439-42; Mot. at 17.)   These rates have not been

updated recently-- and apparently cannot be updated due to the lack of more recent empirical

data.  (*See* AR Doc. 1459 (Turtle Expert Working Group 2000 Stock Assessment) at 80 ("We do

not have a reliable estimate of the number of turtles that are susceptible to fishing mortality in a

given year").)

     In its 2001 Stock Assessment, SEFSC used the model to assess the impact of the

pelagic[13] longline fishery on loggerhead and leatherback sea turtles with and without the

implementation of TED regulations in the Gulf of Mexico shrimp trawl fishery.  (BO AR at 247;

AR Doc. 1435.)  The SEFSC constructed four models based on different assumptions about the

duration of each of the turtle's life stages and ran each model using three different assumptions

for population growth and for sex ratio.  (BO AR at 247.)  The model included a thirty-percent

decrease in small benthic[14] juvenile mortality based on research findings of existing TED

effectiveness and, in some runs, an estimated thirty-percent increase in the survival rate of large

benthic juveniles as a result of implementing a proposed requirement for larger TEDs.  (*Id.*)

"The results of the modeling indicated that the proposed change in the TED regulations . . .

would have a positive or at least stabilizing influence on the subpopulation . . . in nearly all

scenarios."  (*Id.* at 248.)

     In developing the BO, NMFS determined that this population trend model represented the

most reliable method for estimating whether scallop fishing would jeopardize the continued

---

[13]"Pelagic" means "of, relating to, or living in open oceans or seas rather than waters
adjacent to land or inland waters."  AM. HERITAGE DICTIONARY, 4th ed. (2000).

[14]"Benthic" means related to or living on or in the bottom of a body of water.  *Id.*

existence of loggerheads.  In doing so, the agency ruled out several potential alternatives, such as comparing estimated takes to the population size or using nesting data.  The agency could make "no reliable estimates of absolute population size" of loggerhead turtles (*id.* at 245), and nesting data was inadequate to estimate "statistically reliable trends" for several of the loggerhead subpopulations.  (*Id.* at 246.)  Due to the cyclical nature of both loggerhead nesting and natural events that cause sea turtle mortality, multiple years of nesting data are needed to detect relevant nesting trends and the survey program had only recently begun on some beaches.  (*Id.*)  Certain South Florida and northern subpopulation nesting beaches had been surveyed for a long enough period of time to allow the Turtle Expert Working Group ("TEWG") to conclude that the South Florida subpopulation has been increasing over the last couple of decades and that the northern subpopulation is stable or declining.  (*Id.*)  The agency did not rely on this information, however, out of concern that nesting data only represents population numbers for mature females (which are not necessarily impacted to the same degree as males or juveniles) and that the benefits of the most recently promulgated measures to address loggerhead capture and mortality-- such as requirements that shrimp trawlers utilize TEDs-- would not be evident on nesting beaches for many years, given the late age to maturity.[15/]  (*Id.* at 246, 272; *see also id.* at 248 (referring to the SEFSC 2001 model and supporting literature as the "best available scientific information" on loggerhead turtles).)

After rejecting these possible methodologies, the BO proceeds to analyze the "status of the species" based on the SEFSC 2001 model.  Intending to give loggerheads the "benefit of the

---

[15/]Recent data suggest that it takes between 20 and 38 years for a loggerhead turtle to reach maturity.  (BO AR at 247.)

doubt," the BO only considers model runs that assumed an annual population growth rate of 0.97 (three-percent decline), an average age to maturity of 39, and a thirty-five percent or fifty-percent proportion of females in the population (whereas estimates for two of the four subpopulations are sixty-nine percent and eighty percent).  (*Id*. at 248.)  The results of the modeling indicated that "western Atlantic loggerhead subpopulations should experience stable or increased subpopulation growth in the coming years as the current immature age classes reach maturity, and as shrimp trawl mortality of mature loggerheads is reduced."  (*Id*. at 249.)  The BO also notes that NFMS has taken action to increase the survival of pelagic immature loggerheads by ten percent through regulation of longline fisheries, which would result in even greater positive population growth according to the model.  (*Id*. at 248-49.)

The BO's jeopardy section represents the agency's analysis of whether the effects of the continued implementation of the Scallop FMP will reduce the reproduction, numbers, or distribution of loggerheads in the action area and whether any such reduction will reduce the species' likelihood of surviving and recovering in the wild.  (*Id*. at 295.)  The jeopardy analysis restates the model-based determination that the loggerhead population is likely to stabilize or increase in the coming years and concludes that, given this baseline trend and the implementation of ongoing conservation measures, the 479 annual expected fatalities from scallop fishing dredge and trawl gear are unlikely to jeopardize the species.  (*Id.* at 300-01.)  *See also supra* note 7.  Although this estimate of future takes does not figure into the model's calculations, the BO asserts that the model's starting growth rate and mortality rates for each life stage nevertheless "include[] impacts as a result of the scallop fishery."  (*Id.* at 300.)  Its rationale for this crucial assertion is as follows:

In selecting to use this model approach, NOAA Fisheries has assumed that the current population growth rate for loggerhead sea turtles is not worse than 0.97. This is a reasonable assumption given that the 0.97 population growth rate used in model scenarios by [the SEFSC 2001 model] was based on data collected for northern subpopulation loggerheads before action was taken to address many of the known anthropogenic impacts to this subpopulation and the species as described under section 4.0. Therefore, while the modeling approach does not seek to specifically identify or quantify the various anthropogenic impacts to loggerhead sea turtles, the starting growth rates reflected the on-going mortality experienced by the subpopulation. This includes impacts as a result of the scallop fishery. As explained in section 2.1, the scallop fishery has a long history and was well established prior to the 1990's. Therefore, the mortality rates used in [the SEFSC 2001 model] would have included mortality to loggerheads as a result of operation of the scallop fishery. In addition, the scallop fishery became a limited access fishery in 1994 and management measures have served to maintain or decrease, not increase, effort over the past decade. While scallop landings have increased over time, including in the Mid-Altantic, there is evidence that these are due to increased recruitment of scallops in the region. . . . Therefore the estimated bycatch of sea turtles in the scallop dredge fishery for the 2003 scallop fishing year is expected to be less than the level of mortality from the scallop fishery that is subsumed in the starting mortality rates for [the SEFSC 2001 model].

(*Id.* at 300.) In other words, current mortalities from scallop vessels are assumed to be "subsumed" in the rates derived from decades-old mortality data because, *inter alia*, the scallop fishery has "operated similarly throughout its history." (*Id.* at 222 (Decision Mem., Dec. 15, 2004).)[16] This underlying assumption is hotly disputed by plaintiff.

### a.   Uncertainty

With this background in mind, the Court can now turn to the first prong of plaintiff's

---

[16]The Decision Memo states: "If there were impacts from the scallop fishery, they should affect the juvenile survival stages and the SEFSC 2001 models used juvenile survival rates from a time when any measurable (but not separable) effects of the scallop fishery would be subsumed in the juvenile survival and mortality rates." (*Id.* at 222.) Thus, the mortality rates do not change based on current observations of turtle capture and mortality.

argument-- that the use of the model was simply too speculative to support a no-jeopardy

conclusion.  (*See* Tr. at 10, 16.)  By picking and choosing runs from the 2001 model-- a model

designed to evaluate management measures in the Gulf of Mexico shrimp trawl fishery and the

pelagic longline fishery, not the scallop fishery-- plaintiff argues that the agency was "playing

with assumptions" that gave it "a kind of constellation of feelings" about population trends of

loggerhead turtles, but did not meet the higher burden of "ensuring" against jeopardy.  (*Id.* at

8-9.)

    For support, plaintiff points to criticisms of the model by Dr. Selina Heppell, a sea turtle

expert and one of the model's original developers, in a letter to the NMFS Chief Science

Advisor.  The letter, submitted approximately four months after NMFS issued the BO, claimed

that the agency had misused the SEFSC 2001 model and urged the agency to reevaluate its no-

jeopardy decision.[17]  (Mot. Ex. A. (Letter to Michael Sissenwine from Selina S. Heppell,

_____

[17] Defendants oppose the Court's review of this document (Defs.' Opp'n at 19), while
FSF "doubts its propriety, but reserves its objections."  (FSF's Opp'n at 10 n.8.)  Although as a
general rule a court reviewing agency action is confined to information before the agency at the
time it made its decision, the D.C. Circuit has acknowledged that a court may consider additional
evidence "when the agency failed to consider factors which are relevant to its final decision;" to
allow the court to "understand the issues more clearly" in a complex case; and "where evidence
arising after the agency action shows whether the decision was correct or not."  *See Esch v.
Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (delineating eight exceptions in dicta).  The Court
agrees with plaintiff that Dr. Heppell's letter falls within the exceptions recognized in *Esch.*  In
*Carlton v. Babbitt*, 26 F. Supp. 2d 102 (D.D.C. 1998), also a review of a BO, the Court allowed
the plaintiffs to supplement the administrative record with a declaration by a scientist who
explicitly disclaimed the FWS's "optimistic reading" of an article he had written.  *Id.* at 108.
Since the article was the only support provided by the agency to demonstrate the scientific
validity of the BO's conclusions, the Court found that "[the author's] understanding of his own
article [was] particularly relevant and should have been considered in connection with this
matter."  *Id.* (citing *Esch*, 876 F.2d at 991).  Again, in *Southwest Ctr. For Biological Diversity v.
Norton*, 2002 WL 1733618, *7 (D.D.C. July 29, 2002), the Court admitted a scientist's
declaration that "purport[ed] to undermine key evidence supporting FWS' . . . decision" not to
list a species under the ESA.  The scientist claimed that FWS had misapplied the listing criteria

Mar. 13, 2005) ["Heppell Letter"].)  One of Dr. Heppell's concerns was that "[b]ecause the life

table models are deterministic and include several unknowns, it is not obvious what constitutes a

'conservative' set of parameters."  (Heppell Letter at 1.)  She listed the many uncertain

parameters such as age at maturity, TED effectiveness, sex ratios, and the population growth rate,

and pointed out that "[t]hese models were developed, in the absence of most quantitative stock

assessment parameters, to generally evaluate the relative impacts of different management

strategies on sea turtle populations.  The caveats of these models and the sources of their

parameters are not detailed in the BiOp."  (*Id.* at 2.)  In sum, she recommended that the Council

"abandon these heuristic, highly uncertain life table models as evidence for population change or

stability."  (*Id.*)

    As mentioned above, plaintiff does not dispute that the model is the best available

science.  (*See, e.g.*, Tr. at 20.)  Instead, it relies on the Court's obligation to ensure that the

agency's decision was "reasoned," *Defenders of Wildlife*, 958 F. Supp. at 679, and argues that

_____

he had developed.  *Id.*  Although the scientist had submitted the declaration after the close of the
administrative record, the timing was not dispositive in the absence of evidence that plaintiffs
had delayed in bad faith.  *Id.* at *8.

    These cases are on point.  As one of the developers of the SEFSC 2001 model's
precursor, Dr. Heppell's understanding of the model is "particularly relevant" and allows the
Court to better understand the model's complexities.  *Carlton*, 26 F. Supp. 2d at 108.  Moreover,
her letter bears directly on whether the agency "considered factors which are relevant to its final
decision," *Esch*, 876 F.2d at 991, and "purports to undermine key evidence supporting" NMFS's
decision.  *Southwest Ctr.*, 2002 WL 1733618, at *7.  While Dr. Heppell submitted her comments
only after the agency had issued the December 2004 BO, the delay is understandable, since there
was no public comment period for the BO and she only recently became aware of the BO's use of
the model.  (Heppell Letter at 2.)  For these reasons, the Court denies the government's request to
strike the Heppell letter.  *See also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230,
247 n.10 (D.D.C. 2003) (citing lower court cases recognizing *Esch* exceptions).

although the SEFSC 2001 model may have been the "best available science," the model is so ill-suited to the purpose for which it was used, and so fraught with uncertainties, that the agency could not rationally conclude that the scallop fishery was not likely to jeopardize the continued existence of loggerheads.  As explained by plaintiff, this contention is based on the legal premise that the agency has the burden of showing that it can "insure" against jeopardy, 16 U.S.C. § 1536(a)(2), and that if the agency cannot provide such "insurance," it must reach a jeopardy conclusion and provide "reasonable and prudent measures" if the agency action is to go forward. (*See* Tr. at 13-16.)  *See also* 16 U.S.C. § 1536(b)(3)(A).

The weight of authority is contrary to plaintiff's legal premise.  Time and again courts have upheld agency action based on the "best *available*" science, recognizing that some degree of speculation and uncertainty is inherent in agency decisionmaking, even in the precautionary context of the ESA.  Though the ESA should not be implemented "haphazardly, on the basis of speculation," *Bennett v. Spear*, 520 U.S. 154, 176 (1997), an agency need not stop in its tracks when it lacks sufficient information.  *See Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) ("the Service must utilize the 'best scientific . . . data *available*,' not the best scientific data *possible*") (emphasis in original); *Southwest Ctr.*, 215 F.3d at 60 (agency had to rely on inconclusive data to make a decision whether to list the species; the "best scientific data" requirement does not obligate an agency to conduct new independent studies); *Blue Water Fisherman's Ass'n v. NMFS*, 226 F. Supp. 2d 330, 338 (D. Mass. 2002) ("[I]mperfections in the available data do not doom any agency conclusion. . . . The agency's conclusion need not be airtight and indisputable."); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 115 (D.D.C. 1995)

("The government is entitled to rely on analyses and opinions that are non-dispositive without its decision being rendered arbitrary and capricious.").

In response to this authority, plaintiff cites *Conner v. Buford*, 848 F.2d 1441 (9th Cir. 1988), where the court determined that FWS had to "give the benefit of the doubt to the species" and find jeopardy in light of the agency's conclusion that there was "insufficient information" available to prepare a comprehensive biological opinion concerning oil and gas leases. *Id.* at 1453-54. More recently, however, the same court held that FWS could properly reach a no-jeopardy opinion and allow a proposed action to proceed even in the face of scientific uncertainty about the action's impact on the species. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992) ("[NMFS's] decision to go ahead with the [proposed action], despite some uncertainty about the effects of [the proposed action] on the [species], was not a clear error of judgment" where the agency "supported its conclusions with ample data and analysis.").[18]

These cases demonstrate that the many uncertainties that trouble Dr. Heppell are not sufficient to doom the model. A recent case from the D.C. Circuit is instructive in this regard. In *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004), the D.C. Circuit considered the EPA's decision to designate a point eighteen kilometers south of the Yucca

---

[18]/*Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041 (1st Cir. 1982), cited by plaintiff, also fails to persuade the Court that giving the "benefit of the doubt" to the species requires a jeopardy finding in the face of uncertainty. There, the court found an Administrative Law Judge's decision to issue a discharge permit to an oil refinery was clear error, in part because "real time simulation studies [that would assure the low risk of an oil spill], which EPA, the State of Maine, and the Coast Guard all view[ed] as being necessary to a final determination of safety [were] to be delayed until the Coast Guard ha[d] adequate funds to undertake them." *Id.* at 1053. While agencies are under a duty to "to prevent the loss of any endangered species, regardless of the cost," *Tennessee Valley Auth. v. Hill*, 473 U.S. 153, 188 n.34 (1978), there is no analogous safety test that NMFS, or anyone else, has recognized as "necessary" to complete the jeopardy analysis in the scallop-turtle context but has refused to undertake.

Mountain nuclear waste disposal repository as one location at which compliance with

environmental standards would be measured.  The plaintiff argued that the agency's factual

assumption that humans were not likely to settle any closer to the repository was wrong and that,

accordingly, the agency's decision was irrational.  The Circuit rejected plaintiff's argument,

explaining that "to satisfy the APA's rational-decisionmaking standard, EPA need not *prove* that

humans will never settle within the controlled area; the agency needs only a reasonable basis for

believing that they are unlikely to do so."  *Id.* at 1276 (emphasis in original).  Similarly, the

agency needs only a reasonable basis for concluding that its action is "not likely" to jeopardize

the species.  16 U.S.C. § 1536(a)(2).  That NMFS's decision arose in the context of the ESA does

not change this basic standard.

       Plaintiff argues that the model is so uncertain as to be arbitrary-- that it is past the point of

having "occasional imperfections," *Bldg. Indus.*, 247 F.3d at 1247, but rather is wholly

disconnected with reality.  *See Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C.

Cir. 1998).  While it is true that the "best available science" does not *always* pass muster under a

rationality test*, see Nat'l Wildlife Fed'n*, 332 F. Supp. 2d at 177,[19/] the Court is unable to

conclude in this case that the agency's choice of methodology was irrational.  Although experts

have suggested that reliable take limits cannot be established without quantitative data gathered

from "in-water" surveys (*see* AR Doc.1459 at 81, 92), the regrettable fact is that the necessary

---

[19/]In *National Wildlife Federation*, the BO under review had identified disturbances of the
endangered Florida panther's habitat but "ma[de] no effort to discuss what [the disturbances]
meant for panthers" before coming to its no-jeopardy conclusion. This was a "clear failure to
make 'a rational connection between the facts found and the choice made.'"  332 F. Supp. 2d at
177.  Thus, the Court invalidated the BO even though it could not find a violation based on the
agency's failure to use the best available science.  *Id.* at 180.

data simply does not exist.  NMFS does not deny that a thorough quantitative analysis based on

empirical estimates of population size would be a superior way to analyze the impact of the

scallop fishery on sea turtles, but has reasoned that in the absence of the necessary data, the

SEFSC 2001 model is the next best alternative.  Defendants and intervenor maintain that, given

the paucity of information on sea turtles and the difficulties of using the data that does exist, "[a]

different or more complex model was not available and could not even be constructed."[20]

(Defs.' Opp'n at 11.)

    In response, plaintiff cites *Columbia Falls*, 139 F.3d 914, to support its claim that the

2001 SEFSC model was irrationally applied.  There, the D.C. Circuit established that "[a]n

agency's use of a model is arbitrary if that model 'bears no rational relationship to the reality it

purports to represent.'" *Id.* at 923 (quoting *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005

(D.C. Cir. 1997)).  The Court found that the use of a model to determine toxicity of a byproduct

of aluminum production was arbitrary and capricious because all the available evidence showed

that the byproduct would actually be exposed to disposal conditions which were quite different

from those simulated by the model.  *Id; see also Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259,

1265-66 (D.C. Cir. 1994) (striking down EPA's designation of a particular chemical as a "high

risk" pollutant because the record did not show a rational relationship between EPA's air

dispersion model and the designated chemical's properties).  But whereas the model in *Columbia

Falls* simply did not simulate the proper situation for the problem at hand, the SEFSC 2001

―――――――――――――

[20]Defendants also point out that three independent experts reviewed the SEFSC 2001
model (*see* Defs.' Opp'n at 14; BO AR at 248), but this fact does not necessarily undermine
plaintiff's argument that the BO's *use* of the model in the context of a jeopardy analysis was
irrational.

model was based on painstaking analysis of the existing literature on the life cycle of loggerhead sea turtles.  (*See* AR Doc. 1435; BO AR RefDoc 41.)  Thus, even if flawed or limited in its application, the model bears a rational relationship to the reality it purports to represent.  The model as originally developed was intended to help the agency understand population trends of loggerhead turtles in response to new conservation measures.  The BO also relies on the model to understand population trends in a world where those conservation measures have in fact been implemented.  Especially since neither plaintiff's expert, Dr. Heppell, nor any other expert, has offered a superior-- or in fact *any*-- alternative for analyzing jeopardy, the Court cannot agree that the agency's use of the model, despite its uncertainties, was inherently irrational.  *See generally Oceana I*, 2005 WL 555416, at *17 (noting that "the Court will only reject the Secretary's choice of model 'when the model bears no rational relationship to the characteristics of the data to which it was applied'") (internal citation omitted); *CLF v. Mineta*, 131 F. Supp. 2d at 26 n.15 ("It is not the Court's role to second-guess agency evaluations of complex scientific data within the agency's expertise.").[21]

---

[21]As of the June 30 hearing, plaintiff seems to have abandoned its argument that a *qualitative* model is inherently inappropriate for the purpose of evaluating jeopardy.  (*See, e.g.,* Reply at 2-3; Heppell Letter at 2.)  It is worth noting, however, that the agency is not obligated to undertake a quantitative population analysis.  There is nothing inherently problematic about using predictions of population trends to analyze the status of a species or effects of the proposed action.  If the agency uses a scientifically valid model, which takes into account the effects of a proposed action and determines that a species' population will stabilize or increase, it is reasonable for the agency to conclude that the action will not threaten the species' existence. *See, e.g.*, *San Francisco Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F. Supp. 2d 1001, 1023 (N.D. Cal. 2002) ("[f]aced with great uncertainty" agencies reasonably "declined to speculate" as to what specific effects changed shipping at the Port of Oakland would have on introduction of invasive species, but reasonably concluded ballast water volume would decrease over time as a result of the changes, and that implementation of management measures would further decrease risk to ecosystem).

b.      **Mortality Data**

The Court's conclusion that the agency's use of the SEFSC 2001 model represents a

reasoned approach does not resolve plaintiff's further claim that the data used in the model was

so stale as to undermine the model's utility.[22/]  The most recent mortality data used in the model

were collected in a study of strandings undertaken between 1986 and 1989.  (*See, e.g.*, Heppell

Letter at 1.)  Other data incorporated into the model were collected in the mid-1970s.  (*Id.*)

Given that the entire purpose of the jeopardy analysis is to analyze the current and future impacts

of the scallop fishery on turtle population trends, the agency was obligated under section 7(a)(2)

to consider whether the model reflected these impacts despite its use of decades-old data.  *See*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency's

failure "to consider an important aspect of the problem" renders its decision arbitrary and

capricious); *Burlington Truck Lines*, 371 U.S. at 168 (agency must demonstrate a "rational

connection between the facts found and the choice made").[23/]

---

[22/]The SEFSC 2001 model incorporates old data in at least two ways.  First its assumption
that the starting population growth rate for loggerheads is 0.97 (or a 3% decline) appears to be
based a study published in 1983.  (*See* AR Doc. 1435 at 10, 21.)  Second, the model's analysis of
whether this growth rate will increase, decrease or stabilize uses estimated survival/mortality
rates for each of the turtle's life stages, which are also drawn from studies published in the 1980s.
(*See id.* at 19.)  While plaintiff focuses only on the latter use of the data, it is worth noting that if
the starting growth rate assumption is conservative, as defendant argues, any undue optimism in
the life stage survival rates might be somewhat offset.

[23/]Dr. Heppell highlighted this problem in her March, 13, 2005 letter when she observed:

The survival rate parameters for turtles in the size classes taken by the scallop
fishery are not based on a current empirical estimate; *unless* there has been no
change in the mortality rate of loggerhead turtles caught in the scallop fishery
since the mid-1970s or late 1980s, the mortality rate estimates used in the models
of Heppell et al. 2003 and NOAA Tech Memo 455 [the SEFSC 2001 model] do
not account for this fishery.

To justify its use of decades-old data, both the BO and the Decision Memorandum rely on the assumption that the scallop fishery was operating similarly or more intensively at the time the data was collected than it is today. *See supra* Section II(B)(1). As described previously, the BO justifies this assumption by explaining that that "the scallop fishery has a long history and was well established prior to the 1990s. Therefore, the mortality rates used in [the SEFSC 2001 model] would have included mortality to loggerheads as a result of operation of the scallop fishery. In addition, the scallop fishery became a limited access fishery in 1994 and management measures have served to maintain or decrease, not increase, effort over the past decade." (BO AR at 300.) The underlying assumption is that the scallop fishery has not changed for the worse with respect to turtle fatalities since the 1970s and 1980s, but rather, has either remained the same or improved given the conservation measures implemented since that time.

Plaintiff contends that the record contradicts this assumption and that, instead, "there likely has been a substantial increase in loggerhead mortality rates."[24] (Mot. at 18.) In the alternative, plaintiff argues that, even if the Court cannot conclude that the agency's assumption is factually incorrect, the agency failed to adequately articulate its reasoning and to consider information contained in Amendment 4 that would have indicated that DAS levels have increased substantially since the 1970s. Thus, according to plaintiff, the BO failed to "rationally

---

(Heppell Letter at 1 (emphasis added).)

[24]Plaintiff also argues that the BO's assumption that there will be a ten-percent increase in the survival of juvenile turtles as a result of longline regulations is unrealistic and speculative. (Mot. at 19-20.) However, as defendant points out, the BO did not rely on this assumption in coming to the "no jeopardy" conclusion; it only noted that population growth among loggerheads would be positive if this increase in survival rates were to occur. If the increase does not occur, the population trend "will at the very least stabilize." (*See* BO AR at 299.)

consider these issues" or to provide a reasoned basis for the BO's critical assumption. (Tr. at 70.)  The Court will address each of these arguments *seriatum*.

###   i.      Does the record support the agency's assumption ?

To assess whether plaintiff is correct in arguing that the agency's assumption is factually "wrong" (Reply at 4), one must consider what aspects of the scallop fishery are relevant to turtle mortality.  As the BO recognizes, one cannot simply look at the increase in scallop landings and conclude that more or fewer turtles are likely to be affected today than in the 1970s and 80s.[25/] (BO AR at 300.)  At various points in their pleadings, the parties identify a variety of factors, including DAS, tow times per DAS, total area swept, total fishing time, vessel size and power, the size of the crew, and the geographic scope of the fishery, as significant to the analysis of whether turtle mortalities as a result of scallop fishing have increased or decreased since the 1970s.  (*See, e.g.*, Reply at 4-6; Defs.' Opp'n at 16-17; Mot. at 18-19; FSF's Opp'n at 12-15.)  As may be expected, changes in technology, limits on crew size, access restrictions, gear regulations, and other management measures (including Amendment 10 and Framework 16) have affected each of these variables in complex ways.  For instance, FSF cites to data showing that the total area swept by scallop vessels declined from 30,000 nautical miles squared (nm$^2$) in the early 1990s to about 3,500 nm$^2$ currently (*see* FW16 AR Doc. 190 at B-1439), even while other measures of "effort" (such as landings or DAS) may have increased.  Further complicating the inquiry is the lack of complete historical data.  For example, while plaintiff cites evidence from Amendment 4 that DAS levels in the 1970s and 1980s were lower than current levels, as will be

_____

[25/]As discussed below, the agency also recognized that DAS were not the only relevant variable.

discussed more fully *infra*, these data are biased insofar as they underreport relevant information regarding certain types of vessels and large geographic areas.  (*See* FSF's Surreply at 3-5.)[26]

As this debate demonstrates, the Court is not in a position to resolve the issue of whether NMFS's assumption is wrong based on the equivocal evidence in the record.  Even plaintiff hedges its assertion that turtle mortalities have increased since the 1970s and recognizes the difficulties in stating this as fact.  (*See, e.g.*, Mot at 18 (there "*likely* has been a substantial increase in loggerhead mortality rates" and "[c]hanges in industry practices *may* also have contributed to increasing take of sea turtles") (emphasis added).)  Nor can the expert relied on by plaintiff, Dr. Heppell, definitively say that the agency's assumption is unfounded.  (*See* Heppell Letter at 1 ("*unless* there has been no change in the mortality rate of loggerhead turtles caught in the scallop fishery . . . ") (emphasis added).)  Also recognizing the impossibility of determining with certitude the number of loggerhead takes attributable to the scallop fishery in the past relative to the numbers today, the BO presents its premise that there has been a stable or downward trend as an assumption, not as a fact.

─────────────────────

[26]Although plaintiff originally framed the debate in terms of landings (Mot. at 18 (highlighting the "increase in mortality indicated by the landings data"); *id*. at Ex. 6 depicting historical landings data)), defendants responded by arguing that that "increased landings are not the result of increased fishing time," but rather are the result of a more efficient fishery that has experienced a significant increase in biomass along with a significant decline in total area swept. (Defs.' Opp'n at 16-17.)  To support the claim that fishing time had in fact decreased since the 1970s and 1980s, FSF referred to a description of the scallop fishery's history in Amendment 4 to the Scallop FMP, which had not been included in the Administrative Record.  (FSF's Opp'n at 13-14.)  Thus, in its Reply, plaintiff submitted a table from Amendment 4 to show that the level of DAS in the 1970s and 1980s was in fact lower than the current level of DAS.  (Reply, Ex. A.) In response, FSF moved to file a surreply disputing plaintiff's analysis of DAS, which plaintiff opposes. Although FSF opened the issue by referencing Amendment 4 in its opposition, the Court agrees with FSF that it must allow intervenor an opportunity to respond to plaintiff's analysis of the Amendment 4 data, which appeared for the first time in plaintiff's Reply.

In sum, whether an old estimate of loggerhead mortality is a good estimate for today's threat from scallop fishing is an extremely complicated question, the answer to which necessarily involves specialized knowledge of the scallop fishery. Evaluation of the equivocal evidence pointed to by the parties is exactly the type of scientific debate that the Court is not meant to wade into. *CLF v. Mineta*, 131 F. Supp. 2d at 26 n.15. Nor is it the Court's role to substitute its evaluation of the data for that of the agency. *AOC*, 183 F. Supp. 2d at 11-12 ("Where the agency decision turns on issues requiring the exercise of technical or scientific judgment, it is essential for judges to 'look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'") (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)).   A conclusion based on this evidence should be left to the agency's discretion unless the record is devoid of support for the agency's position, which is not the case here. *See Baltimore Gas & Elec. Co.*, 462 U.S. at 87. Furthermore, as discussed *supra* Section II(B)(1)(a), when the agency lacks information to make a sound estimate, some degree of speculation may be the only way to proceed. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997) ("Administrative decisionmaking is not an exact science, and judicial review must recognize that some arbitrariness is inherent in the exercise of discretion amid uncertainty."); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990) ("even when the FWS's opinion is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information--*i.e.*, information the Service did not take into account--which challenges the

opinion's conclusions") (quoting *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459-60 (9th Cir.

1984)); *Greenpeace Action*, 14 F.3d at 1336 ("[T]he fact that the [agency's] evidence is 'weak,'

and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.')

(citing same); *Hammond v. Norton*, 370 F. Supp. 2d 226, 264 (D.D.C. 2005) (adequate BO need

not include current baseline population data if such data does not exist).

Although plaintiff criticizes the model's ability to produce an accurate estimate of the

scallop fishery's impact on loggerheads, the Court cannot agree that the agency's use of the

model or the underlying data was inherently irrational.  Mortality rates constructed from data in

the 1970s and 1980s may not be perfect proxies for today's loggerhead mortality rates, but

especially as these rates are the only viable estimates, the Court cannot conclude that the

agency's reliance on them is unreasoned.  The Court is not "writing on a blank slate," and

therefore, it may not "substitut[e] its judgment for that of NMFS" unless the agency has strayed

"outside the bounds of reasoned decisionmaking."  *CLF I*, 229 F. Supp. 2d at 34 (internal

quotations omitted).

### ii.    Did NMFS articulate a reasoned basis for its assumption?

The only remaining question is whether the agency provided a reasoned basis for its

assumption and considered all the relevant data.  The Supreme Court has held that "when an

agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the

decision on that account 'if the agency's path may reasonably be discerned.'"  *See Alaska Dep't of

Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v.

Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  In evaluating whether the agency

articulated a basis for its decision, the Court cannot rely on post-hoc rationalizations.  Instead, it

must look to the justification provided by the agency in the record.  *See, e.g.*, *El Rio Santa Cruz*

*Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health and Human Servs.*, 396 F.3d 1265, 1276

(D.C. Cir. 2005) ("[A]n agency's discretionary order will be upheld, if at all, on the same basis

articulated in the order by the agency itself.") (internal quotation omitted).  Here, the agency has

explained that  (1) that the scallop fishery was "well established prior to the 1990s," and (2) that

"management measures have served to maintain or decrease . . . [fishing] effort since 1994."

(BO AR at 300.)  While the BO's explanation for its assumptions about the history of the scallop

fishery may not be exhaustive as one might like, the Court can "reasonably . . . discern[]" the

basis of the agency's decision when it considers the record as a whole.  *Bowman Transp.,* 419

U.S. at  286.

        First, the record makes clear that prior to 1982, the scallop fishery was unrestricted and

uncontrolled by federal authorities.  (AR Doc. 138 at C1169.)  As indicated in the BO, NMFS

began limiting access to the fishery in 1994 with Amendment 4.  As scallop stocks have

recovered, resulting in a higher level of "recruitment"[27] (BO AR at 236), and in turn, higher

catch rates, the fishery has generally become more efficient.[28]  Additional management measures

were implemented after Amendment 4 to further decrease fishing effort and to conserve the

resource.  Management measures have served to impose crew limits, gear restrictions, and DAS

_____

        [27]As defined in Amendment 10's glossary, "recruitment" is "a new year class of scallops
measured by the resource survey" and the "resource survey . . . is able to capture scallops
betweeen 20-40 mm, but more reliably at between 40 and 60 mm."  (AR Doc. 138 at C2137.)
Thus, recruitment is a measure of the number of young scallops that survive to grow to a certain
size, and an indicator of the general health of the fishery.

        [28]For example, catch rates per tow have significantly increased since 1982.  (AR Doc.
138 at C1175 (Fig. 2.).)  *See also id*. at C1171 (Table 2) (showing increase in landings per DAS
since 1990s).)

limits.  (*Id.* at 237.)  Combined with the recovery of the resource, such measures have produced

an eighty percent decline in "effective effort."  (Defs.' Opp'n at 16 (citing AR Doc. 138 at

C1664).)  The BO therefore recognizes that although scallop landings have increased over time,

there is no reason to believe that *landings* correlate with turtle fatalities.  (BO AR at 300.)  The

agency has reasoned that reductions in *effective effort* have resulted in lower mortality rates for

loggerheads from scallop vessels since the less time vessels spend dredging or trawling for

scallops, the less likely they are to harm sea turtles.  While stated with "less than ideal clarity" in

the BO's jeopardy section, the agency's reasoning is certainly discernable from the record.

*Bowman Transp*, 419 U.S. at 286.

        The BO's discussion of future trends in the fishery as a result of management measures

further explains and supports the agency's reasoning.  The BO notes that Amendment 10 and

Framework 16 aim to boost the productivity of the fishery by shifting effort "from less

productive open areas to areas of high scallop abundance."  (BO AR at 233.)  This shift means

that "fishing effort could actually decrease since scallop vessels fishing in the controlled access

area are expected to catch a greater number of scallops in less time."  (*Id.* at 234.)  For example,

"it is . . . estimated that the actual fishing time per DAS will drop to 1-3 hours/day in the access

areas" and the "area swept by dredge gear . . . in the Mid-Atlantic region is expected to decline

from 3,000 nm$^2$ in 2003 to 2,100 nm$^2$ in 2004."  (*Id.*)  Thus, the BO concludes:  "Given that the

proposed Framework 16/39 is expected to result in an overall reduction in the number of scallop

tows, . . . tow times, and . . . overall area swept, the risk of interactions between scallop fishing

gear and ESA-listed sea turtles are also likely to be reduced since there would be fewer

opportunities for interactions."  (*Id.*)  The BO also recognizes that "a shift in scallop fishing

effort from Mid-Atlantic open areas to the Georges Bank access areas should be of benefit to sea

turtles by reducing the amount of scallop fishing effort in areas where sea turtles are more likely

to occur to areas where sea turtles are unlikely to occur." (*Id.*)  These facts support the agency's

recognition of the scallop fishery's transformation from an unregulated, inefficient free-for-all in

the 1970s to a more contained, focused, and productive fishery today which, it logically follows,

is less likely to harm loggerhead turtles.  The agency has thus articulated a reasoned basis for

assuming that the SEFSC 2001 model analysis takes into account the current and future level of

loggerhead fatalities from scallop gear.[29]

Plaintiff nonetheless criticizes the agency for failing to consider Amendment 4, which

contains DAS and landings data going back to the 1970s, as well as a narrative discussion of the

history of the fishery.  (Reply, Ex. A (attached to Asher Decl.) (hereinafter "Am. 4").)  Plaintiff

argues that the data in Amendment 4 undermine defendant's assumption that "data from the

1970s and 1980s are not stale because fishing effort 20 to 30 years ago was actually greater than

it is now" by showing that "to the contrary-- fishing effort was substantially less."  (Reply at 6.)

---

[29]/Cases remanding a BO for failure to articulate a rational connection between the facts
found and the choice made have invariably been much more clear cut.  For instance, in *National
Wildlife Federation v. Norton*, Judge Robertson found that while the BO had calculated the
panther "disturbance intensity" that would result from the Army Corps of Engineers' issuance of
a permit for the operation of a mine, "the FWS 'analysis' abruptly ends" and "[t]he BiOp makes
no effort to discuss what these percentages mean for the panther."  332 F. Supp. 2d at 177.  In
*American Wildlands v. Norton*, one of the other cases in this jurisdiction to remand a BO, the
agency's decision had a serious internal contradiction: without explanation, it included
hybridized species as both a threat and part of the population counted.  193 F. Supp. 2d 244, 255
(D.D.C. 2002).  *See also Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028,
1037 (9th Cir. 2001) (where NMFS acknowledged that short-term effects on salmon could
potentially jeopardize the species, NMFS's reliance on long-term regrowth of trees as adequate
mitigation was arbitrary and capricious).

By failing to address the data in Amendment 4, plaintiff argues, the agency has failed to consider all relevant aspects of the jeopardy analysis.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

There are two problems with this argument.  First, the BO makes clear that the agency does *not* assume that loggerhead mortality correlates with DAS alone.  (*See* BO AR at 234.) Rather, the BO recognizes that even while DAS remain the same or increase, the time spent dredging (and resulting risk to loggerheads) can decline as the fishery becomes more efficient. (*Id.*)  As evidenced by the record, DAS are only one, incomplete indicator of time spent dredging and trawling.  (*Id.* (estimating that "actual fishing time per DAS will drop to 1-3 hours/day in the access areas" based on the abundance and size of scallops.)  It is just this sort of gain in efficiency that the BO refers to when it explains in the context of the jeopardy analysis that increased landings are due to increased "recruitment" (*i.e.*, abundance and size of scallops) (*id.* at 300), and not to increased fishing time.

Second, the 1970s data is riddled with obvious problems that diminish its usefulness as a benchmark for comparison with today's fishery.[30]  Table 14 indicates that weighout data from Virginia ports are not available from the 1970s, Mid-Atlantic weighout data are only available

---

[30]/Whereas the data suggest that "for most of the 1970s, fishing effort was just one third of the current level," during the 1980s the "effort level on average was about 10% below current levels."  (Reply at 5.)  Thus, the key issue is the accuracy of the 1970s data, as it represents a much more significant challenge to the agency's assumption.

from 1976 onward,[31] and none of the data includes scallop trawlers.[32]  (Am. 4 at Table 14.)

Given the glaring underreporting in the data, it is impossible to say that Amendment 4 "settles

the issue" that fishing effort was substantially less in the 1970s than it is today, as plaintiff

claims.  (Tr. at 18.)  Therefore, the Court is unwilling to fault the agency for failing to consider

this biased data, which would have been inconclusive in any event.   For the same reason, no

purpose would be served by engaging in the futile task of remanding to the agency to ask it to

compare the obviously incomplete DAS data in Amendment 4 to current DAS data.  *See, e.g.*,

*Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 79 (D.C. Cir. 1999) (In

the absence of the possibility that, but for its error, an agency would have reached a different

result, "affirmance entails neither an improper judicial invasion of the administrative province

nor a dispensation of the agency from normal responsibility.") (internal quotation omitted).

## 2.        Trawl Take Estimates

Another source of uncertainty and alleged irrationality cited by plaintiff is the agency's

estimate of takes from scallop trawl gear.  (Mot. at 24-27.)  Bycatch data for the trawl fishery, in

contrast to the dredge fishery, was almost nonexistent at the time the BO was prepared.  The only

observed takes of sea turtles were in October 2004 when three loggerheads were observed

captured by a single vessel on a single trip.  (BO AR at 291.)  Only five trips were observed

---

[31]As is clear from FSF's Surreply at 5, New Jersey did not join the weighout system on
which Table 14 is based until 1978 and Virginia did not join until 1981.  At least as of 2000,
these two states had the second and third largest landings of scallops, accounting for forty-three
percent of all scallop landings on the Atlantic coast.

[32]In 1975 and 1976 scallop landings from trawl vessels (as opposed to dredge vessels)
"peaked at nearly 25% of the total," though they otherwise remained below ten percent.  (Am. 4
at 93.)

between 2001 and 2003, with 0.6% observer coverage in 2001, 0.1% coverage in 2002, and zero

observed trips in 2003.[33/]   *Id*. at 190.   On November 29, 2004, NMFS asked its Science and

Research Director whether there was any way of  "generating a scientifically sound estimate of

sea turtle takes in scallop trawl gear[.]"  (*Id.* at 162.)  The Director responded that "[a]fter

reviewing the level of observer coverage in the scallop trawl fishery and comparing aspects of the

scallop dredge and trawl fisheries, we have concluded that sufficient information to support a

scientifically defensible estimate of sea turtle bycatch in the scallop trawl fishery is not currently

available."  (*Id.* at 189.)  In light of this response, the BO concludes that "the best estimate

possible" for loggerhead mortality in the trawl component of the scallop fishery is three, the

number of takes actually observed in October 2004.  (*Id.* at 291.)  The BO acknowledges,

consistent with expert comments within the agency (*see id.* at 198), that this estimate might be

"an underestimate" and suggests that the agency will consider reinitiating consultation if

warranted by new information on takes in the trawl fishery.  (*Id.* at 291.)

Plaintiff urges the Court to conclude that this admittedly low estimate represents a failure

to give the "benefit of the doubt" to the species.  (Mot. at 25-26.)  However, the ESA does not

require an agency to reject the "best estimate possible" (BO AR at 291) in favor of a more

"conservative" estimate that, according to its scientists, would be lacking in support.  As

explained above, the Court's role is not to order the agency to gather additional data, but to

evaluate the agency's decision based on the data it had at the time.  *See, e.g.*, *Bldg. Indus. Ass'n*,

---

[33/]A December 15, 2004 memorandum explains why observer coverage of the trawl
fishery was so low in comparison to the dredge fishery.  Given the limited funding available for
observer coverage, NMFS's Protected Species Branch appears to have prioritized obtaining a
bycatch estimate for the scallop dredge fishery in 2003 and was planning to shift focus to the
trawl fishery in 2004.  (BO AR at 208.)

247 F.2d at 1246-47.  Furthermore, it is not clear that a "benefit of the doubt" mandate should

apply to every assessment made by the agency.  Although there is a need for accurate and

precautionary estimates under the ESA where possible, the trawl mortality figure has little effect

on the BO's overall conclusions.  Given the small proportion of the fishery represented by

trawlers (five percent), even a "conservative" estimate of trawl takes would likely be dwarfed by

the number of loggerheads hurt or killed by dredge vessels.  And in fact, as already explained

(*see supra* note 16), the agency's ultimate conclusion does not depend on these quantified take

estimates, but rather on a population trend model.  Thus, the overall jeopardy analysis withstands

scrutiny even if the specific estimate of trawl takes could have been stated more conservatively.

### 3.        Action Area

Plaintiff next challenges NMFS's definition of the "action area" and its analysis of the

"environmental baseline" as failing to reflect current loggerhead mortality.  In both cases,

plaintiff is concerned that the agency has not taken into account the wide range of threats facing

loggerheads apart from the Mid-Atlantic scallop fishery.

 Under the ESA, "action area" is defined as "all areas to be affected directly or indirectly

by the Federal action and not merely the immediate area involved in the action."  50 C.F.R.

§ 402.02.  "Indirect effects are those that are caused by the proposed action and are later in time,

but are still reasonably certain to occur."  *Id*.  The BO states that "the only effects on listed

species are the direct effects of interactions between sea turtles and scallop dredge and trawl gear.

*No indirect effects on ESA-listed species are expected*."  (BO AR at 238-39 (emphasis added).)

Thus, it defines the action area as the area in which the scallop fishery operates.  (*Id*. at 239.)

Plaintiff claims that this definition excludes significant sources of mortality, such as poaching,

habitat loss, and nesting predation on beaches, worldwide long-line fisheries, and the Gulf of

Mexico shrimp trawl fishery, thereby undermining the ESA's purpose to "insure" that the action

is not likely to jeopardize the continued existence of loggerheads.  (Mot. at 22.)  At the very least,

plaintiff argues, the action area should include the areas where mitigating actions -- such as

measures in the shrimp trawl fishery -- are included in the BO's Status of the Species discussion.

(Reply at 11; *see* BO AR at 269, 272.)

Defendants and FSF respond that plaintiff misunderstands the statute by defining "action

area" to include areas where loggerheads are affected by *any* source of mortality, not just the

scallop fishery.  (Defs.' Opp'n at 20.)  Moreover, they argue, if the action area is defined as the

range of loggerheads, the action area would be the same for any federal action that affects

loggerheads.  Such an interpretation would be at odds with the statute's mandate that the

consultation consider each proposed action individually.  16 U.S.C. § 1536(a)(2); *see also* 50

C.F.R. §402.02 ("action area" means "all areas to be affected directly or indirectly by *the* Federal

action") (emphasis added).

Plaintiff relies on this Court's decision in *Defenders of Wildlife v. Babbitt*, 130 F. Supp.

2d 121 (D.D.C. 2001) (hereinafter "*Defenders I*").  There, the Court remanded the BOs of the

FWS and the Bureau of Land Management ("BLM") relating to the Sonoran pronghorn sheep for

failure to properly define the action area and analyze the environmental baseline.  The Court

found that the agency could not exclude federal lands from the action area where pronghorn on

those lands would be directly or indirectly affected by the proposed action, even if the agency had

no authority over those lands.  *Id*. at 129.  As correctly argued by defendants and FSF, *Defenders*

*of Wildlife* is distinguishable.  In that case, FWS and BLM argued that their analysis did not need

to consider other federal activities on the relatively discrete area of land where the Sonoran

pronghorn roamed.  *Id.*  The Court rejected that argument in light of the BO's statements that the

pronghorns on land adjacent to the proposed action-- which had not been included in the action

area-- would be indirectly affected by the FWS and BLM activities under consultation.  *Id.* at 129

n.10.  For example, the BO found that a highway in the immediate area under consideration

threatened to isolate one group of pronghorns from the rest of the population.  The sea turtle BO

does not contain similar findings of "direct or indirect effects" of the scallop fishery outside the

action area as defined by the agency.

Plaintiff next points to *National Wildlife Federation v. NMFS*, 254 F. Supp. 2d 1196

(D. Or. 2003), which is also distinguishable.  In *National Wildlife Federation*, the court

determined that the action area for consultation on the federal Columbia River Power System

was too limited because it did not include the entire range of eight salmon Evolutionary

Significant Units ("ESUs").  *Id.* at 1212.  The court based its finding on the fact that the agency

"ma[de] clear that the short-term survival and recovery of the eight salmon ESUs depend[ed] in

part on range-wide off-site mitigation habitat, harvest, and hatchery actions."  *Id.*  The court was

"left with the firm conviction that the range-wide area [was] therefore indirectly, if not directly,

impacted by [the proposed action]."  *Id.*  However, in a subsequent opinion, the court clarified its

rationale and explicitly rejected an interpretation of the action area that would include "the entire

range where the 12 salmon ESUs may roam."  *Nat'l Wildlife Fed'n v. NMFS.*, Civ. No. 01-640,

slip op. at 7-8 (D. Or. Dec. 17, 2003).

Thus, there is no support for the proposition that the action area must be extended to

include the migratory range of loggerhead turtles.  Any contrary conclusion would contravene the

regulatory definition of "action area," which focuses on the effects of an action in a geographic

"area," and not on a species.  50 C.F.R. § 402.02.

####    4.    Environmental Baseline

The ESA requires that the BO "evaluate the effects of the action and cumulative effects

on the listed species or critical habitat."  50 C.F.R. § 402.14(g).  The "'[e]ffects of the action'

refers to the direct and indirect effects of an action on the species or critical habitat, together with

the effects of other activities that are interrelated or interdependent with that action, that will be

added to the environmental baseline."  50 C.F.R. § 402.02.  The "environmental baseline"

includes

> the past and present impacts of all Federal, State, or private actions and
> other human activities in the action area, the anticipated impacts of all
> proposed Federal projects in the action area that have already undergone
> formal or early section 7 consultation, and the impact of State or private
> actions which are contemporaneous with the consultation in process.

*Id*.  Plaintiff's primary complaint is that although the BO listed federal and state fisheries, federal

vessel operations, dredging, and pollution as occurring within the action area, the agency "neither

quantified the impacts of these activities nor analyzed their impact on the species."  (Mot. at 23.)

Defendants and intervenor counter that "nothing in the ESA or the regulations requires that type

of particularized analysis."  (Defs.' Opp'n at 24.)  They contend that the agency quantified

impacts where it could and provided detailed qualitative information on the full range of threats

facing loggerheads in the action area (and in many cases outside the action area). (*Id.*)

In *Defenders I*, this Court held that "[t]he impact of an authorized incidental take cannot

be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other

incidental take authorized by FWS. . . . The BO must also include an analysis of the effects of the

action on the species when 'added to' the environmental baseline – in other words, an analysis of

the *total* impact on the species." 130 F. Supp. 2d at 127-28 (quoting 50 C.F.R. § 402.02)

(emphasis in original).  Because FWS had merely listed the other activities affecting the

pronghorns without making them part of its analysis, the Court found the BO to be inadequate.

When the agencies issued new BOs on remand, the plaintiffs moved to enforce the Court's order,

claiming that the BOs were still inadequate.  *Defenders of Wildlife v. Norton*, 2003 WL

24122459 (D.D.C. Jan. 7, 2003) (hereinafter "*Defenders II*").  In this second round, the Court

clarified that a BO is adequate if it "takes the baseline seriously and makes a concerted effort to

evaluate the impact of [the agency's] proposed action against that backdrop."  *Id.* at *4.

"*Defenders I* . . . was not . . .  imposing a requirement that each BO include a collective jeopardy

finding, *i.e.*, a determination whether *all* federal agency action, considered together, is likely to

jeopardize the continued existence of [the species]."  *Id.* at *5 (emphasis in original).  The Court

concluded that the BO issued on behalf of the BLM was sufficient because it set out the take

anticipated for nine other agency actions, considered the potential effects of the proposed BLM

action, and specifically acknowledged that the BLM's actions needed to be evaluated in the

context of an environmental baseline showing that Sonoran pronghorns were in "immediate

danger of extirpation."  *Id.* at *4.

Here too, the agency has evaluated the scallop fishery's impact in light of the

environmental baseline even though it does not numerically add the takes from different sources

together, and thus, under *Defenders II*, its analysis is adequate.  Contrary to plaintiff's contention

that the BO omits significant sources of mortality (Tr. at 33-35), the BO in fact includes a lengthy

discussion of anthropogenic effects on loggerhead sea turtles and details the anticipated takes

from other federally authorized fisheries both in its narrative discussion and in a table of anticipated incidental takes attached as an appendix.[34] (BO AR at 249-51, 258-67, 325.) Appendix 2 of the BO lists the number of incidental lethal and non-lethal takes that have already been authorized for seventeen other fisheries and other federal projects. (*Id.* at 325.) The BO also discusses the ways in which the agency and others are working to reduce these and other anthropogenic impacts to improve the baseline. Significantly, the agency recognized that the benefits of these new conservation measures might not be evident on nesting beaches for years to come, and thus, nesting data could not fully indicate the well-being of the species. (*Id.* at 272.) Although the agency could not quantify all sources of mortality and did not have sufficient data to compare the number of those takes it could quantify to an absolute number of loggerheads, plaintiff's "attempt to equate an absence of data with a failure to analyze" does not succeed. *NRDC v. Evans*, 254 F. Supp. 2d 434, 440-42 (S.D.N.Y. 2003) (where researchers concluded that there was nothing definitively known on tilefish gear's effects on tilefish habitat, it was reasonable for the agency to decide not to impose new gear restrictions); *see also Hammond*, 370 F. Supp. 2d at 264 ("Plaintiffs have adduced no authority to support the proposition that in evaluating 'the current status of any endangered species or habitat' in a biological opinion, FWS specifically must include current baseline population data, whether or not those data exist.").

## III.    Bycatch Reporting Methodology

        Plaintiff claims that Amendment 10 unlawfully fails to review bycatch reporting and to

---

[34]For example, NMFS anticipates that the pelagic longline fishery will result in 438 mortalities for the three-year period from 2004-06; that mortalities from the shrimp trawl fishery will number 3,947; and that the Atlantic pelagic fishery for swordfish, tuna and shark could kill up to 381 immature loggerhead turtles each year. (BO AR at 250, 259.) These are only a few examples of the many risks to loggerheads that are specifically addressed in the BO.

establish an adequate standardized bycatch reporting program.  It also alleges that the

Amendment violates NEPA by failing to consider an adequate range of bycatch reporting

methodology alternatives.  (Mot. at 28-32.)

Reflecting Congressional concern about the volume of fish caught and discarded by

commercial fisheries, the Sustainable Fisheries Act of 1996 ("SFA") amended the MSA to define

"bycatch" as "fish which are harvested in a fishery, but which are not sold or kept for personal

use . . . ," 16 U.S.C. § 1802(2), and to require that FMPs

> establish a standardized reporting methodology to assess the amount and
> type of bycatch occurring in the fishery, and include conservation and
> management measures that, to the extent practicable and in the following
> priority--(A) minimize bycatch; and (B) minimize the mortality of bycatch
> which cannot be avoided[.]

*Id.* § 1853(a)(11).  Regulations promulgated by defendants to implement the SFA provide that

"[a] review and, where necessary, improvement of data collection methods, data sources, and

applications of data *must* be initiated for each fishery to determine the amount, type, disposition,

and other characteristics of bycatch and bycatch mortality in each fishery for purposes of this

standard [National Standard 9, 16 U.S.C. § 1851(a)(9)] and of sections 303(a)(11) and (12) [*id.*

§§ 1853(a)(11) & (12)]."  50 C.F.R. § 600.350(d)(1) (emphasis added).

In *Oceana I*, this Court found that the MSA "makes perfectly clear that 'the

establish[ment] of a standardized [bycatch] reporting methodology' is a 'required provision' of

'any fishery management *plan* which is prepared by any Council.'"  2005 WL 555416, at *40

(quoting 16 U.S.C. § 1853(a) and adding emphasis) (alterations in original).  *See also Pac.*

*Marine Conservation Council, Inc. v. Evans*, 200 F. Supp. 2d 1194, 1200 (N.D. Cal. 2002)

(hereinafter "*PMCC*") (deeming unlawful an FMP that failed to mandate an expanded at-sea

observer program although NMFS had determined that such a program was essential).  The Court

concluded that the Secretary's mere "intention" to maintain a five-percent observer coverage

level, while delegating the actual level of coverage and methodology decisions to the Regional

Administrator, did not constitute establishment of a "bycatch reporting methodology."  *Oceana I*,

2005 WL 555416, at *42.  Nor had the Secretary adequately responded to a scientific study

commissioned by Oceana (the "Babcock Study") which determined that coverage should be set at

fifty percent for rare bycatch species and twenty percent for common bycatch species in order to

effectuate the goals of precision and accuracy.[35/]  Although the Secretary was free to choose his

own methodology, ignoring the considerations identified by the study ran afoul of the

requirement that the Secretary must consider the "best scientific information available" in

developing FMPs.  16 U.S.C. § 1851(a)(2).  As such, Amendment 13 did not satisfy the

mandates of the MSA, as amended by the SFA.

    The Court's analysis in *Oceana I* is dispositive.  Like Amendment 13, Amendment 10 fails

to establish a bycatch reporting methodology, but instead gives complete discretion to the Regional

Administrator.  The Council recognized in formulating Amendment 10 that to obtain reliable

bycatch estimates, the agency could not rely solely on the good faith of scallop crew members to

accurately report the volume of fish discarded from their vessels.[36/]  Thus, the Council proposed to

---

[35/]As explained in *Oceana I*: "There are two sources of error in discard estimates
generated by observer programs: 'accuracy, which measures how close the expected value of the
estimate is to the actual value, and precision, which measures how close a series of independent
estimates are to each other'. . . Ideally, a sampling program should produce estimates that are
*both* accurate and precise."  2005 WL 555416, at *41 n.34 (emphasis in original) (citation
omitted).

[36/]Amendment 10 states that "[q]uantitative assessments of bycatch changes in response to
management have not been possible, primarily due to a lack of data.  Sampling frequency by the

expand the live observer ("sea sampling") program in the sea scallop fishery.  But rather than

keying an expansion of the program to some assessment of what levels were necessary to generate

reliable estimates, it instead linked the number of additional observers to a funding mechanism

without considering whether this program would be adequate.  Thus, though it proposes a one-

percent "set aside"[37] to provide funding for increased bycatch coverage, and provides great detail

on the operation of the set-aside (*see, e.g.*, AR Doc. 138 at C1242), Amendment 10 does not set

forth the substance of a reporting methodology for the scallop fishery except in a vague and

conclusory fashion.  Section 5.1.8.1 of the Council's description of management alternatives ("Sea

Sampling") states only that:

> Vessels with sea scallop fishing permits *may* be required by the Regional
> Administrator to carry onboard an observer, whose costs will be born by the
> vessel. . . . The Regional Administrator will determine the number of sea
> sampled trips and distribution by gear and area, taking into account the
> desired level of sea sampling needed to estimate bycatch with an accuracy
> appropriate to the scallop [fishery] at which the bycatch information will
> affect management decisions.  As such, it would be appropriate for sea
> sampling intensity to favor areas of higher than average groundfish and
> turtle bycatch.

(AR Doc. 138 at C1242 (emphasis added).)  Reporting methodology is also addressed in a

---

Sea Sampling Observer Program have [sic] been low due to a lack of funding and belief that
interactions with marine mammals and turtles were rare. . . .  Vessel trip report (VTR) data are
less than useful for this purpose because fisherman rarely report discards (only 9% of 2001 VTRs
from the scallop fishery reporting discards of any species, including scallops) and with such low
reporting rates the data may be biased by area, time, or type of vessel."  (AR Doc. 138 at C1373.)

[37]As explained in the Amendment, the Regional Administrator would deduct one percent
of the TAC for controlled areas and one percent of the allowable DAS in open areas before
calculating final TAC and DAS allocations.  This set-aside would then be allocated so that
vessels carrying observers would be allowed "to land more scallops or fish more DAS" than
would otherwise be authorized.  (*Id.* at C1242.)

discussion of how Amendment 10 meets the requirements of the MSA, but this section simply

refers back to Section 5.1.8.1:

> The FMP relies on a standard data collection program, the Sea Sampling
> Observer Program and provides a funding mechanism to increase the level
> of sampling (Section 5.1.8.1).  These data will improve and be used for
> assessing the amount and type of bycatch occurring in the scallop fishery.

(*Id.* at C1383.)  Likewise, the Final Rule published in the Federal Register notes the establishment

of a set-aside for observers "intended to improve data on scallop catch and bycatch" but mandates

only that "[v]essels issued federal scallop permits are required by the Regional Administrator to

carry an observer onboard if requested. . . ."  69 Fed. Reg. at 35197.

   Defendant and FSF's insistence that this language and other sections throughout

Amendment 10 and Framework 16 establish a "methodology" is unavailing.  In addition to relying

on the statutory arguments made and rejected in *Oceana I*, both defendants and FSF attempt to

distinguish Amendment 10 from Amendment 13.  The government points first to the set-aside, but

admits that this program is "not currently operational."  (Defs.' Opp'n at 41 n.13.)  Even if the set-

aside were in place, however, a funding mechanism is not a *methodology*.  Nor is defendants'

claim that "Amendment 10 sets forth a reporting methodology through a variety of data collection

and analysis techniques" (*id.* at 41) supported by the record.  While the discussions in Amendment

10 cited by defendants recognize the need for "[i]ncreased" observer coverage (AR Doc. 138 at

C1244; *see id.* at C1373-74), discuss the results of bycatch data collection to date (*id.* at

C1372-75), and explain that the costs of additional observers that may be mandated by the

Regional Director will be defrayed by an "expand[ed]" funding program (*id.* at C1374; *see id.* at

C1375, C1755), none of this information "sets forth . . . techniques," as claimed by defendants, or

- 45 -

targets a specific level of observer coverage by area that would produce statistically reliable

estimates of bycatch.  "[A]n FMP that merely suggests a hoped-for result, as opposed to

establishing a particular standardized methodology, does not measure up to the statute's

requirements."  *Oceana I*, 2005 WL 555416, at *40 (internal quotation marks and citation

omitted).  Here, the FMP does not even suggest a "hoped-for result," except that the data will

"improve" and that accuracy "appropriate" to the scallop fishery will be achieved.  (AR Doc. 138

at C1383, C1242.)  Instead of analyzing what type of program -- whether a mandated level of

coverage or some other mechanism[38]-- would succeed in producing the statistically reliable

estimates of bycatch needed to better manage the fishery, the FMP essentially assigns this task to

the Regional Administrator.[39]

FSF also attempts to distinguish the instant case from *Oceana I*.  It argues that, unlike

*Oceana I*, "NMFS does not have boundless authority to determine the deployment of observers and

levels of coverage in specific areas."  (FSF's Opp'n at 32.)  Rather, the Regional Administrator

"*will* determine the number . . . and distribution by gear and area" of observed trips necessary "to

---

[38]Contrary to plaintiff's interpretation (*see, e.g.*, Mot. at 29), *Oceana I* did *not* require that an FMP mandate a specific level of observer coverage.  Rather, the Court held that an FMP may not delegate the development of a standardized bycatch reporting methodology to the Regional Administrator.  Nor did *PMCC* require that FMPs mandate a specific level of coverage in all situations. The failing in *PMCC* was that NMFS had determined that a live observer program was necessary for accurate reporting, but it had nevertheless neglected to establish any type of observer program.  *PMCC*, 200 F. Supp. 2d at 1200.

[39]For example, Amendment 10's EIS estimates that the set-aside funding mechanism would allow for observer coverage of between 2.6% and 31% of open area trips in fishing years 2004-07 and between 5.1% and 29.2% of controlled-access area trips in the 2004 fishing year. (AR Doc. 138 at C1757-58 (Tables 177, 181).)  However, analyzing the impacts of the set-aside program by *predicting* its effects is not the same as "establishing" a program.  There is also a great difference between 2.6% and 31% coverage, and it is unclear from the Amendment what level satisfies the goals of National Standard 9.

estimate bycatch with an accuracy appropriate to the scallop" fishery.[40] (*Id.* (quoting AR Doc. 138

at C1242) (emphasis added in FSF Opp'n).)  Though the Regional Administrator's discretion may

be guided by the goal of achieving an "appropriate" level of accuracy, the statute requires a

methodology, not a goal.  A methodology need not necessarily be detailed, but it must at the very

least provide decisionmakers and the public with a program of what actually will be *done* to

improve bycatch reporting, and why these measures will be sufficient based on the best available

science.  *See Oceana I*, 2005 WL 555416, at *42 (citing example of methodology established for

Pacific highly migratory species fishery).  Here, all that can be deciphered from the FMP is that

coverage will increase by some unspecified amount depending on the availability of set-aside

funding, and that the Regional Administrator is advised to allocate sea sampling intensity

according to bycatch hotspots (*i.e.*, "areas of higher than average groundfish and turtle bycatch").

(AR Doc. 138 at C1242.)  The FMP does not indicate what an appropriate increase would be, or

how bycatch hotspots are to be determined.  Also lacking is any indication as to how the Regional

Administrator should determine the "distribution [of sea sampled trips] by gear and area."  (*Id.* at

C1242.)  FSF points out that the set-aside is not a "cap" on the number of observers per trip and

that the costs of the additional observers that might be "necessary" will be borne by vessels

themselves.  (FSF's Opp'n at 32.)  But this begs the question: What is "necessary"?  The FMP

simply does not provide an answer.[41]

-------------------------------------------------

[40] FSF also cites to a "mandate" that the bycatch program provide data that is "statistically
adequate."  (FSF's Opp'n at 33.)  The record shows that this language only appears in a
paragraph describing the "inten[t]" of the set-aside program, and needless to say, the agency
never defines what satisfies this standard.  (AR Doc. 138 at C1333.)

[41] FSF makes several additional unpersuasive arguments with respect to Amendment 10.
First, it argues that, given the Amendment's advice to focus "sampling intensity to favor areas of

Defendant and intervenor also fail to demonstrate how the agency adequately responded to the Babcock study.  Plaintiff argues that the agency ignored the issue of accuracy, which had been identified as a key consideration in the study.  The government essentially concedes this issue.  It does not argue the point, but refers only to a target of a thirty-percent CV, which pertains to precision and not to accuracy.  (Tr. at 118-20.)  While FSF does maintain that the agency adequately considered the need for both accuracy and precision, it lacks support in the record for its position.  In the agency's response to Oceana's comment on the proposed rule (Comment 33),

_____

higher than average groundfish and turtle bycatch," it was reasonable to give the Regional Administrator discretion to adjust sampling methodology seasonally rather than to establish specific mandates.  (AR Doc. 138 at C1242; FSF's Opp'n at 34.)  But the Court is not suggesting that the FMP should mandate the precise areas where observers must be concentrated for years to come; it only requires that the FMP establish some method for determining observer concentration instead of leaving all decisions to the Regional Administrator's discretion.

FSF's next argument relates to the distinction between the groundfish fishery addressed in Amendment 13, which involved multiple gear types and twenty fish stocks, and the scallop fishery, which involves only one primary gear type.  According to FSF, it was more important to create a detailed methodology in the context of *Oceana I* than it is here. (FSF's Opp'n at 33-34.) While the necessary level of detail may differ, that does not excuse the agency from establishing a program, for the statute does not distinguish between types of fisheries involved.  Regardless of its relative simplicity, the bycatch reporting methodology for the scallop fishery-- just like the reporting methodology for more complex fisheries-- must be included in an FMP, and not left to the discretion of the Regional Administrator.

FSF also claims that the BO's condition that the agency "require observer coverage for the scallop fishery at a level necessary to obtain statistically reliable information on sea turtle bycatch" moots the bycatch reporting issue with respect to sea turtles.  (FSF's Opp'n at 35 (quoting BO AR at 306).)  But again, the statute requires that the FMP establish a methodology, not a vague goal.  Moreover, a statement in the BO's ITS does not come close to establishing a methodology in the FMP.

Finally, FSF points to Amendment 10's requirement that limited access scallop vessels use vessel monitoring systems ("VMS") to provide electronic daily catch reporting. (FSF's Opp'n at 31.)  But these systems are not used to collect bycatch data (*id.*), so it is difficult to see how they could be part of a bycatch reporting methodology.

the agency explained that it "expect[s]" to achieve a certain level of *precision*, but it remained

silent on the issue of accuracy.[42]  69 Fed. Reg. at 35203.

Nor do the other passages cited by FSF show that the agency either took accuracy into

account or decided, as it was free to do, that accuracy was not an important consideration despite

the Babcock study.  For example, FSF claims that the record contains a "methodology . . . based on

'proven' programs." (FSF's Opp'n at 31 (quoting AR Doc. 138 at C1333); *see* Tr. at 124-25.)  But

the cited discussion states only that the set-aside compensation program was "proven" and includes

no discussion of statistical reliability or accuracy except to express an "intent" to provide a

"statistically adequate" level of coverage.  (AR Doc. 138 at C1333.)  Rather, as was the case with

Amendment 13, the Council acknowledged the importance of accurate bycatch estimates (*see* AR

Doc. 25 at A2408), yet it failed to pursue a strategy that would produce them.  Accuracy seems to

have been only an afterthought even in implementing Framework 16, which notes simply that the

one-percent set-aside is "calculated to provide equal to or greater than bycatch estimates accuracy

for most species as NMFS achieves in other fisheries."  (FW 16 AR Doc. 144 at B-507.)  In short,

as found in *Oceana I*, the agency ignored the accuracy issue throughout the process.

-------

[42]The only other evidence that the agency considered the Babcock study appears in the
BO AR.  (*See* FSF's Opp'n at 30 n.28 (quoting BO AR at 207).)  There, a memo recounts a
conversation with an agency staff member who assured the memo's author that the Babcock
study had been taken into consideration when assigning sea turtle bycatch observers to scallop
dredges and that "the [NMFS Science] Center had made calculations . . . to ensure that coverage
was sufficient to obtain a statistically reliable estimate of sea turtle bycatch."  (BO AR at 207.)
This memo does not persuade the Court that the agency considered accuracy in determining how
it would collect bycatch information under Amendment 10 and Framework 16, or that any such
consideration actually made its way into the FMP.

Framework 16 does not cure these problems.  Section 4.1.7 of the Environmental Assessment ("EA") for Framework 16 explains that the chosen alternative for at-sea observers is the "[e]xisting sampling frequency *(whatever can be funded*) funded with a one percent TAC set-aside."  (FW16 AR Doc. 144 at B507 (emphasis added).)  Noted in parentheses is that this option represents the "[s]tatus quo."  (*Id.*)  The Framework goes on to analyze what level of coverage and precision could be achieved with a one-percent TAC set-aside.  It concludes that "a one-percent set aside would be sufficient to achieve the target precision for yellowtail flounder bycatch estimates, a 30% CV,"[43] and that "[t]his alternative is calculated to provide equal to or greater than bycatch estimates accuracy for most species as NMFS achieves in other fisheries."  (*Id.*)  It also notes that if vessels are compensated for their entire cost, the set-aside would result in coverage ranging from nine percent to twenty-eight percent.[44]  (*Id*; *see also id.* at B706-13 (analyzing environmental impacts of chosen alternative, including expected precision levels)).)  But while Framework 16 certainly comes closer to a meaningful analysis, it still puts the cart before the horse, *predicting* sampling frequency, observer distribution, and precision rates based on potentially available funding rather than *establishing* a methodology.[45]  In fact, it goes no further than did Amendment

---

[43]"CV" is short for "coefficient of variation," which is a measure of precision.  According to the government, a thirty-percent CV is an internationally accepted standard of precision.  (Tr. at 120.)

[44]Counsel for FSF explained that this range differs from that predicted in the Amendment 10 document because Framework 16 actually established how the set-aside TAC would be distributed.  (Tr. at 132.)

[45]Framework 16 mentions that "instead of setting a somewhat arbitrary goal of a minimum sampling frequency, the Council is considering changing the goal to achieve a minimum level of precision."  (FW 16 AR Doc. 144 at B707.)  But "considering" improvements does not conform to the statute's mandate of establishing a reporting methodology.

10 towards establishing a plan; it merely does a better job of analyzing the likely results of a one-

percent set-aside.  It states that the set-aside is expected to achieve levels of accuracy reached in

other fisheries (*id.* at B507), but does not explain why those levels are adequate here.  While the

logistics of paying for observers is a fair consideration in establishing a particular bycatch reporting

methodology, the statute does not permit the agency to work backwards in this manner.

      The Court's analysis of the provisions cited by defendants and intervenor also should not

obscure the reality of the situation: the set-aside -- the primary basis for the claim that there is an

improved "standardized reporting methodology" -- has not been implemented and the bycatch

reporting program goes on in its admittedly deficient state.  *See supra* note 36.  (*Compare* Defs.'

Opp'n at 41 n.13 (describing current program as permitting "10% observer coverage in *access*

areas") and AR Doc. 138 at C1374 (stressing need for data from *open* areas).)  When the agency

recognizes that its existing program is inadequate, "[a] 'methodology' that simply retain[s] the

status quo [is] unacceptable."  *Oceana I*, 2005 WL 55416, at *40.

      For these reasons, the Court will remand the portion of Amendment 10 concerning the

bycatch reporting methodology for revision in accordance with the requirements of the MSA.

Since these portions are severable from the rest of the FMP, no purpose would be served by the

disruptive approach of vacating other parts of the plan.  *See Oceana I*, 2005 WL 555416, at *43

n.36.[46/]

---

[46/]Given the Court's resolution of plaintiff's MSA claims, it need not reach plaintiff's
NEPA claim.  *See Oceana I*, 2005 WL 555416, at *43 n.35.

**IV.     Essential Fish Habitat**

A "primary purpose" of Amendment 10 was to fulfill the MSA's mandate to "minimize to

the extent practicable" the adverse effects of fishing on essential fish habitat ("EFH").[47/]  (AR Doc.

138 at C1192.)  The Environmental Impact Statement ("EIS") prepared as part of Amendment 10

also responds to a court order requiring the Council to complete a "new and thorough" NEPA

analysis for the Scallop FMP, along with other FMPs.  *AOC*, 183 F. Supp. at 5.  Plaintiff claims

that NMFS has nevertheless violated NEPA by failing to consider Oceana's proposals for habitat

protection in Amendment 10.

**A.     Statutory Background**

The SFA amended the MSA to make protection of EFH a priority.  Without protective

measures, scallop dredges and bottom trawls can harm groundfish habitat.  (*See, e.g.*, AR Doc.

1270 at D-04-697.)  These devices disturb the ocean bottom, particularly gravel and sand substrate

that is an important environment for juvenile groundfish.  To preserve this vital habitat, FMPs

must "describe and identify [EFH] for the fishery . . . , minimize to the extent practicable adverse

effects on such habitat caused by fishing, and identify other actions to encourage the conservation

and enhancement of such habitat."  16 U.S.C. § 1853(a)(7).

The designation of EFH protective measures is a federal action that must comply with

NEPA.  NEPA requires all federal agencies proposing "major Federal actions significantly

affecting the quality of the human environment" to examine their environmental effects and inform

the public of the environmental considerations involved in agency decisionmaking.  42 U.S.C.

---

[47/]EFH is defined as "those waters and substrate necessary to fish for spawning, breeding,
feeding or growth to maturity."  16 U.S.C. § 1802(10).

§ 4332(2)(C).  These disclosures normally take the form of an EIS.  Since NEPA is a procedural

statute, it does not require an agency to reach a given decision in light of the information it collects

and weighs.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  Rather,

the statute's purposes are to ensure that the agency considers the environmental effects of its

actions and to "guarantee[ ] that the relevant information will be made available to the larger

audience that may also play a role in both the decisionmaking process and the implementation of

that decision."  *Id.* at 349.

> **B.**      **Factual Background**
>
> **1.**      **Oceana's Proposals**

During the development of Amendment 10, Oceana offered three proposals: (1) excluding

scallop dredging from hard-bottom areas; (2) prohibiting scallop dredging in areas with EFH for

overfished species; and (3) restricting scallop dredging to the most-productive areas for scallop

fishing, while prohibiting dredging in hard bottom areas.  (*See* AR Doc. 472 at D-02-308,

D-04-628-39.)  Plaintiff claims that the agency failed to consider these proposals during its

preparation of the EIS.

Plaintiff's first proposal echoed recommendations from the agency's own experts.  In May

2000, the EFH Technical Team and the Scallop Plan Development Team drafted a memo and

guidelines for "incorporating habitat considerations into scallop rotational management strategies."

(AR Doc. 192 at D-00-453.)  The memo noted that the "prime habitat for scallops, coinciding with

the most productive scallop fishing areas, are areas with gravel and fine pebbles, gravelly sand, and

flat sand."  (*Id.* at D-00-450-51.)  The guidelines included four suggestions, two of which were: to

"[a]void all known gravel or hard-bottom areas, or [to] [a]void gravel or hard-bottom areas where

biogenic[48]/ structure is present or recovering."  (AR Doc. 192 at D-00-451 & 453 (footnote added).)

Likewise, those who participated in NMFS's 2001 Gear Effects Workshop concluded that gravel

habitats were most at risk from scallop fishing gear.  (*See* AR Doc. 402 at D-02-71.)

When the Council developed Framework 15 in 2002, it considered and rejected an

alternative that would have "prohibit[ed] scallop dredging in gravel, cobble, and other hard-bottom

areas."  (AR Doc. 594 at D-02-910.)  It reasoned that "while there is ample scientific evidence that

these areas provide an important benefit to some species," those benefits would be mitigated

because the Scallop FMP may only regulate scallop fishing gear and other harmful fishing would

go on in these hard-bottom areas.  (*Id.*)  Framework 15 indicated that alternatives in Amendment

10 to the Scallop FMP and Amendment 13 to the Groundfish FMP "will consider alternatives to

restrict various forms of bottom-tending fishing gear in identified areas of habitat vulnerable to

adverse effects [from such gear], . . . [which] may include . . . establishing scallop management

areas that differentiate hard-bottom areas."  (*Id*. at D-02-910-11.)  Plaintiff appears to interpret this

statement as a "promis[e] to consider" the gravel-closure alternative in Amendment 10.  (Mot. at

45.)

## 2.      Amendment 10

Amendment 10, which succeeded Framework 15, considered seventeen alternatives

(including sub-alternatives) for EFH protection, eleven of which proposed various long-term, year-

round closures for scallop fishing.  In summary, the Council considered closing areas to scallop

vessels to better protect hard-bottom habitat, both inside and outside existing groundfish stock-

---

[48]/"Produced by living organisms or biological processes."  AM. HERITAGE DICTIONARY,
4th ed. (2000).

rebuilding closed areas (Alternatives 3a, 3b, and 4); relying on Amendment 10's rotational scheme

to minimize effects on EFH by reducing bottom-contact time (Alternative 2); regulating scallop

vessel gear (Alternatives 10 and 11);[49] closing areas based on a model's balancing of EFH value

and scallop productivity (Alternatives 5a, 5b, 5c, 5d, and 7); closing areas consistent with existing

scallop closed-access areas (Alternative 6); and providing additional funding for habitat research

(Alternative 12). (AR Doc. 138 at C1297-C1316.)  The EIS evaluates each alternative with respect

to numerous variables including, for example, sediment composition, habitat sensitivity, and the

types of species present in the closure areas.  (*Id.* at C1822-C1930.)  There is no doubt that the

Council devoted considerable energy to preparing this portion of the EIS, and in fact, the

discussion of EFH alternatives and their respective impacts spans hundreds of pages.  (*Id.* at

C1470-C1587, C1822-C1983.)  Based on its finding that none of the other alternatives was

practicable, the Council chose to implement the suite of measures proposed in Alternatives 2, 6, 10

and 12.

### 3.    Framework 16

Though the scallop fishery and the groundfish fisheries have overlapping ranges, the agency

addressed habitat protections for each fishery separately and developed two independent EISs, one

for Amendment 10 and one for Amendment 13 to the Groundfish FMP.  According to plaintiff,

NMFS directed Oceana to reserve any comments pertaining to the scallop fishery for the

---

[49]Alternative 10 regulates the use of rock chains, which protect scallop vessels from
damage in rocky areas.  Without rock chains, scallop vessels are less likely to dredge hard-
bottom areas.  (AR Doc. 138 at C1854.)  Alternative 11 increases the minimum scallop dredge
ring size to four inches.  According to the Amendment 10 EIS, four-inch rings will increase
dredge efficiency for some types of scallops.  Whenever dredge efficiency is increased, bottom
contact time (which is harmful to EFH) is reduced.  However, the EIS also notes that four-inch
rings will increase bottom contact time in some areas.  (*Id.* at C1235.)

Amendment 10 process, rather than submitting them for Amendment 13.  (Tr. at 104.)  Although

some of the habitat alternatives in the respective EISs were identical, the agency considered some

alternatives for Amendment 13 that were not part of the Amendment 10 process.[50/]   It was one of

these Amendment 13-only alternatives that the agency eventually selected for closing certain areas

to groundfish vessels.  The agency's chosen closures for Amendment 10, however, did not entirely

match up with the groundfish habitat closures, resulting in a situation in which some areas were

closed to vessels using scallop gear but not other bottom-tending mobile gears, whereas some areas

were closed to all bottom-tending mobile gears, though both sets of closures were intended to

minimize adverse effects on groundfish EFH to the extent practicable.  (FW16 AR Doc. 144 at

B498.)

      To harmonize these habitat closure areas, the agency issued a joint framework adjustment --

Framework 16/39 (herein referred to as "Framework 16") -- covering both the scallop fishery and

the groundfish fishery.  69 Fed. Reg. 63460 (Nov. 2, 2004) (*reproduced at* FW16 AR Doc. 306).

According to the Council, implementation of both sets of closures would have caused

"impracticable restrictions on scallop fishing."  (FW16 AR Doc. 144 at B472.)  Framework 16

considered three alternatives in its EA[51/] -- the Amendment 10 closures, the Amendment 13

_____

      [50/]According to the agency, a late developing alternative in Amendment 13 (Alternative 10, options a and b) could not be introduced and analyzed in time for the public hearings on Draft Amendment 10.  After final approval of the Amendment 10 alternatives, the Council determined that Alternative 10b was the most practicable alternative for reducing impacts on groundfish EFH from bottom-tending mobile gear and selected it for Amendment 13.  (FW16 AR Doc. 144 at B472.)

      [51/]An EA is a preliminary document which "briefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9.  After considering the EA, the agency may then decide to issue either a finding of no significant impact or a more detailed EIS.

closures, or both sets of closures -- and chose the Amendment 13 closures.  (*Id.* at B-528-30.)

Thus, the habitat measures chosen during the Amendment 10 process have been superceded by

Framework 16.  The Scallop FMP closures are now identical to the Groundfish FMP closures in

Amendment 13.

In *Oceana I*, plaintiff challenged Amendment 13's habitat measures under NEPA.  The

Court rejected plaintiff's claim, holding that the agency had considered an adequate range of

alternatives for the purpose of minimizing habitat destruction to the extent practicable.  *Oceana I*,

2005 WL 555416, at *33.  Plaintiff's failing in that case was that it "focused on numbers rather

than the quality of protection each of the alternatives affords, and it considered the closure

alternatives in isolation."  *Id.*  Plaintiff now attacks Amendment 10's habitat alternatives from a

slightly different angle, arguing that the EIS is inadequate under NEPA and the APA because the

agency "failed to consider Oceana's three habitat proposals," two of which the Council had on

prior occasions conceded were "reasonable" during the Framework 14 and 15 rulemakings.  (Mot.

at 40.)[52]/

---

[52]/The fact that Framework 16 not only superceded Amendment 10's habitat closures, but
replaced them with the Amendment 13 closures which have already been validated by this Court,
raises an issue as to whether plaintiff's claim might be moot, or alternatively, precluded by
*Oceana I*.  However, as explained by plaintiff, although Framework 16 replaced Amendment
10's habitat closures with those of Amendment 13, the alleged failure to consider Oceana's
proposals in the Amendment 10 process constitutes a distinct procedural defect that the Court
could not have considered in *Oceana I*.  Moreover, defendant's argument that plaintiff's claim
should fail because plaintiff does not address the Framework 16 EA independently is unavailing.
(*See* Tr. at 105 ("[T]heir challenge to Amendment 10 is moot. . . .  They amended their claim to
challenge Framework 16 . . . .  Oceana hasn't carried its burden of showing that those three
alternatives in Framework 16 are arbitrary.").)   As noted by plaintiff, Framework 16 "depends
for its validity on the validity of the habitat action in [Amendment] 10."  (*Id.* at 104.)  The same
alternatives that Oceana complains were left out in developing Amendment 10 were necessarily

C.      **Legal Standards**

The heart of an EIS is its analysis of a reasonable range of alternatives to the agency's proposed action.  These alternatives should be presented so as to "sharply defin[e] the issues and provid[e] a clear basis for choice."  40 C.F.R. § 1502.14.  While an EIS should "[r]igorously explore and objectively evaluate all reasonable alternatives," *id*., and an agency may not limit itself to only one end of the spectrum of possibilities, *see, e.g., Sierra Club v. Watkins*, 808 F.Supp. 852, 872 (D.D.C. 1991), the range of options considered by the agency is "bounded by some notion of feasibility," and the decisionmaker need not evaluate all conceivable options.  *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978).  Rather, the adequacy of an EIS is evaluated according to a "rule of reason," given the scope and purpose of the proposed action. *Tongass Conservation Soc'y. v. Cheney*, 924 F.2d 1137, 1140 (D.C. Cir. 1991).  Thus, in the context of EFH measures, "the inquiry is whether a range of alternatives as defined in terms of EFH protectiveness-- encompassing much more than the simple percentage of closed areas-- was adequately evaluated."  *Oceana I*, 2005 WL 555416, at *34.  A court's role in evaluating a NEPA challenge is "not [to] substitute its own policy judgments for those of the agency," *Tongass*, 924 F.2d at 1140, but to "ensure that the agency took account of [the relevant] factors and that its decision was not arbitrary and capricious."  *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 62 (D.C. Cir. 1988).

Relying on the premise that NEPA required NMFS to develop Oceana's three proposals, plaintiff frames the dispute as a factual question: "If the Court concludes that the agency did not

---

left out of Framework 16's analysis. (*See* Third Am. Compl. ¶¶ 292-93. )  Thus, the Court may consider plaintiff's Amendment 10 arguments to determine the legality of both Amendment 10 itself and Framework 16.

consider Oceana's proposed alternatives, but instead considered alternatives that are significantly

distinguishable and have different consequences, then Amendment 10 and its EIS are unlawful."

(Reply at 29.)  Thus, plaintiff is essentially arguing that the "reasonable range of alternatives"

required under NEPA must include Oceana's proposals.

Plaintiff relies on *Dubois v. United States Dep't of Agriculture*, 102 F.3d 1273 (1st Cir.

1996), which held that

> an agency must *on its own initiative* study all alternatives that appear
> reasonable and appropriate for study at the time, and must also look into
> other significant alternatives that are called to its attention by other agencies,
> or by the public during the comment period afforded for that purpose.

*Id.* at 1291 (quoting *Seacoast Anti-Pollution League v. Nuclear Regulatory Comm'n*, 598 F.2d

1221, 1230 (1st Cir. 1979)) (emphasis in *Dubois*).  But *Dubois* was decided in a completely

different context.  There, plaintiffs challenged the expansion of a ski resort and complained that a

particular alternative for a water source for snow-making-- artificial storage ponds instead of

natural lakes-- had not been considered even though public comments had brought it to the

agency's attention.  Whereas the agency in *Dubois* ignored a discrete and obvious proposal for

mitigating environmental harm, NMFS had to evaluate habitat closures based on a multitude of

factors.  Moreover, other courts have not followed the First Circuit's imposition of such extensive

duties on the agency under NEPA, applying instead the "rule of reason" described above.  *See*

*Oceana I*, 2005 WL 555416, at *34 (distinguishing *California v. Block*, 690 F.2d 753 (9th Cir.

1982), in which the agency had overlooked the "obvious" alternative of allocating more than a

third of a national forest to wilderness).)

Plaintiff also points to *Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984), in which the D.C. Circuit found that the Federal Energy Regulatory Commission had failed to satisfy its duty to consider "significant and viable" alternatives for calculating oil pipeline rate bases. *Id.* at 1511 n.54. The agency had acknowledged its own choice of methodology was "substantially flawed," but failed to consider an alternative proposed by numerous parties. *Id.* at 1511. Plaintiff argues that its proposals for protecting EFH were similarly well known to the agency and significant enough to merit development as formal EFH alternatives. Defendant, on the other hand, frames Oceana's claim as a desire to see its proposals implemented "verbatim," and argues that NMFS's serious effort to consider those proposals and to design "substantially similar" alternatives was sufficient. (*See* Defs.' Opp'n at 40 (quoting *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990) ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.")).

While it is true that agencies have a duty to consider "significant and viable alternatives" identified through public comments, *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987), and that "the failure of an agency to consider obvious alternatives has led uniformly to reversal," *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986), the duty to consider all such alternatives does not extend to situations where the possibilities are so numerous and the goals of the action so complex that the agency cannot possibly consider every significant alternative in a reasonable time period. Rather, in these circumstances, the agency has discretion to choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goals of the action. *See Vermont Yankee*, 435 U.S. at 551

(agency has discretion to develop a feasibile number of alternatives); *see also City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) ("The goals of an action delimit the universe of the action's reasonable alternatives.") (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (internal quotation marks omitted)).  Fishery management is exceedingly complex, as is the goal of minimizing adverse effects on EFH *to the extent practicable*.  *See Oceana I*, 2005 WL 555416, at *34-35; *see also CLF II*, 360 F.3d at 28 ("by using the term 'practicable' Congress intended . . . to allow for the application of agency expertise and discretion in determining how best to manage fishery resources").[53/]  Given the agency's complex and multi-dimensional task, the agency was not required to consider the exact alternatives proposed by Oceana, but only to consider a "reasonable range of alternatives as defined in terms of EFH protectiveness," *Oceana I*, 2005 WL 555416, at *34, and to incorporate the thrust of Oceana's proposals and concerns into the decisionmaking process.  *City of Brookings*, 822 F.2d at 1169-70.

### D.    Analysis

Having defined the relevant standard, the Court now turns to the substance of plaintiff's claim.  Plaintiff first argues that the alternatives are deficient because none takes into account its proposal to close all gravel or "hard-bottom" areas to scallop dredging.  (*See, e.g.*, AR Doc. 472 (Oceana Aug. 30, 1999 letter) at D-02-335.)  According to Oceana, the agency determined that this alternative was reasonable during the Framework 15 process and promised to consider it for Amendment 10.  *See supra* Section IV(B)(1).  Whether such a "promise" was indeed made,

---

[53/]Furthermore, as noted by the Council teams which worked on developing Amendment 10:  "Balancing the value of fish habitats and the needs of fisheries to maximize yield when the fishery overlaps sensitive habitat is a very difficult task.  For scallops, this task is even more difficult than for other species because . . . scallops can only be harvested in the habitats where they occur."  (AR Doc. 192 at D-00-452.)

defendants contend that Alternatives 3a, 3b, and 4 in Amendment 10 were designed to protect hard-bottom habitats consistent with the thrust of Oceana's proposal.  The EIS states that, "Alternative 3 was intended to protect complex hard-bottom and other sensitive and complex habitats."  (AR Doc. 138 at C1849.)  Alternative 4 also aimed "to protect hard-bottom habitats" while remaining consistent with the habitat alternatives proposed for the Groundfish FMP.  (*Id.* at C1299; *see also id*. at C1850.)  While these alternatives left many gravel areas susceptible to damage from scallop gear, they encompassed a significant percentage of the gravel, bedrock, and gravelly sand in the analysis area.[54/]  Moreover, "the three alternatives were very effective for protecting EFH for species in New England that have EFH highly vulnerable to bottom tending gear as opposed to the other closed area alternatives."  (Defs.' Opp'n at 38.)  Defendants also point to the proposal in Alternative 10 to regulate the use of rock chains on scallop vessels as evidence of their further efforts to take into account Oceana's concerns, since discouraging the use of rock chains would make it more difficult for scallop vessels to fish in hard-bottom areas.  (*Id.* at 38-39.) *See supra* note 49.

According to plaintiff, the Amendment 10 EIS nevertheless failed to make gravel areas a priority when designing its EFH alternatives.  In plaintiff's view, alternatives protecting less than a third of gravel areas in the analysis area did not reflect Oceana's proposal.  (Mot. at 38-39.)  And, according to plaintiff (*id.* at 38, Reply at 32), the only alternative that closed more than 32% of the

---

[54/]Alternatives 3a and b contained 13% of bedrock, 32% of gravel, and 22% of gravelly sand in the analysis area.  Alternative 4 contained 10% of bedrock, 25% of gravel, and 18% of gravelly sand.  (AR Doc. 138 at C1829-30.)  The Council deemed Alternative 3 impracticable because of the "dramatic social and economic impacts" that would result from closures of the Great South Channel.  (*Id*.)  Alternative 4 was impracticable due to significant revenue losses to fisheries and because its boundaries overlapped the rotational management areas defined by Amendment 10.  (*Id.* at C1924.)

gravel in the analysis area (Alternative 7) (*see* AR Doc. 138 at C1829 (Table 201)) was itself made up mostly of sand and mud (*see id.* at C1830 (Table 202)) and could not be viewed as a serious contender since it closed 78% of the fishery area.[55]  (*See id.* at C1860 (Table 223) (Alternative 7 would affect 78.4% of groundfish productivity and 88.6% of monkfish productivity); *see also id.* at C1830 (Table 202) (showing that no alternative is composed of more than 7% gravel or 35% gravelly sand).)

Plaintiff makes a similar argument with respect to its proposal to prohibit scallop dredging in areas with sensitive EFH for overfished species.  (*See* AR Doc. 472 at D-02-309 (Oceana Mar. 4, 2002 letter).)  Rather than placing a greater value on habitat relied upon by overfished species, the location of EFH for overfished species did not directly influence closure designations. For example, in designing Alternative 7-- one of the alternatives defendants claim addressed Oceana's proposal (Defs.' Opp'n at 39)-- the EIS considered the most valuable habitat areas to be those with the greatest "'prevalence of EFH designations in each ten-minute square,'"[56] without regard to which species would be affected.  (Reply at 31 (quoting AR Doc. 138 at C1304).)  In Alternative 5-- the other alternative claimed by defendants to focus on sensitive EFH for overfished species (Defs.' Opp'n at 39)-- the EIS used "stock status" in each ten-minute square as only one of four "decision criteria" in determining which areas to close.[57]  (*Id.* at 30.)  Thus, the

_____

[55]The next largest closure alternative after Alternative 7 is Alternative 9, which closes an area ten times smaller (*i.e.*, 7.5% of the analysis area).  (*Id.* at C1826.)

[56]A "ten-minute square" is ten minutes of longitude by ten minutes of latitude (AR Doc. 138 at C2138), or 100 square nautical miles (Third Am. Compl. ¶ 173 n.2.).

[57]The EIS explains how the Council developed Alternative 5:  "Closed areas were determined on the basis of a model that assigned a value for EFH importance and fishery productivity (in the scallop, groundfish, and monkfish fisheries) in each ten minute square from

location of EFH for overfished species played only an indirect role in the agency's design of

alternatives.  The agency went on to evaluate alternatives for their relative effectiveness with

respect to protecting the EFH of overfished species whose EFH is highly vulnerable to scallop

fishing (AR Doc. 138 at C1842), but did not specifically design an alternative that would be

especially effective in protecting habitat for these species.

     Based on this record, plaintiff may be correct that the agency did not incorporate wholesale

Oceana's first two proposals as habitat closure alternatives.  Whereas Oceana and others proposed

closing "all" hard-bottom areas, the Council's alternatives closed only a percentage of these areas.

Whereas Oceana and others proposed prioritizing EFH of overfished species in designing closures,

the Council also focused on other variables, such as habitat sensitivity to bottom-tending gear and

value of an area to the fisheries.  Again, however, a failure to implement Oceana's exact proposals

is not sufficient to invalidate the EIS.  The question is whether the agency has thus limited itself to

"only one end of the spectrum of possibilities," *Oceana I*, 2005 WL 555416, at *34, or ignored an

"obvious" alternative that would better achieve the MSA's goals.

     The Court cannot fault the agency for failing to incorporate Oceana's exact proposals into

its design of a feasible range of habitat alternatives.  Because of the complexity of factors involved

in effectively protecting habitat, the proper "range" of alternatives is not obvious; "quality of

---

the southern border of Canada to the northern border of South Carolina.  Closed areas were then
designated based on four decision criteria for each ten minute square: 1) reliance of the stocks on
bottom habitat (life history considerations), 2) stock status, 3) relative value to the fisheries and
4) vulnerability of bottom habitat.  The model identified one closed area . . . for each of the
management areas (e.g., Gulf of Maine, Georges Bank, Southern New England and Mid-
Atlantic)."  (AR Doc. 138 at C1304.)  Alternative 7 was based on the same model except that
EFH value was assigned by prevalence of EFH in each ten-minute square instead of by the four
decision criteria.  *Id.*

protection" can be defined in many ways.  Oceana emphasized protection of hard-bottom habitats

and EFH for overfished species, both relevant variables.  If the agency had overlooked these crucial

concerns in designing alternatives, despite the notice provided by Oceana and others, the Court

might well have cause to find the agency's process unlawful.  *See, e.g.*, *Farmers Union Cent.*

*Exch.,* 734 F.2d at 1511.  But that is not the case here.  The agency did not overlook these

concerns, but merely weighted them differently than Oceana would have liked.  That the agency

failed to consider a specific percentage of hard-bottom habitat closures (100%) requested by

Oceana does not mean it did not respond to Oceana's concerns.  The agency did not consider

habitat closures in isolation as Oceana does; it also developed alternatives that would protect

habitat through gear restrictions, and recognized that Amendment 10 and Framework 16 are

expected to significantly reduce fishing effort, which in turn helps to minimize impacts on EFH.

As discussed in *Oceana I,* "[t]he identification of what particular combination of alternatives

protects EFH and therefore warrants detailed consideration lies within the Secretary's 'area of

special expertise' and is entitled to deference."  2005 WL 555416, at *35.  Thus, the Court "will

not presume to substitute its own judgment for the Secretary's considerable expertise in this area."

*Id*.

Furthermore, the agency's definition of alternatives is consistent with the scope and

purpose of the action as defined by the statute.  As in *CLF I*, 229 F. Supp. 2d at 34, "[p]laintiffs'

criticism . . . is ultimately one of degree, and not kind. That is to say, plaintiffs fault the NMFS for

failing to give habitat protection . . . the full emphasis that plaintiffs believe they deserve, not that

the NMFS failed to respond to the statutory directives to the extent that it deemed practicable under

the circumstances in which [the management measures were] adopted."  *See also CLF II*, 360 F.3d

at 28 (rejecting plaintiffs' claim that Framework 14 did not substantively comply with the MSA

because "plaintiffs essentially call[ed] for an interpretation of the statute that equates

'practicability' with 'possibility,' requiring NMFS to implement virtually any measure that

addresses EFH . . . concerns so long as it is feasible").

Oceana's third proposal was to isolate for closure the most sensitive habitat areas with the

least impact on scallop fishing.  As stated in a March 2002 letter to the Council, Oceana proposed

that it "(1) exclud[e] dredging from gravel "hard bottom" areas and (2) restrict[] scallop dredging

to those areas that are the most productive and leav[e] other less-productive areas inaccessible to

the scallop fishery."[58/]  (AR Doc. 472 at D-02-308.)  Alternative 7 at least attempted to realize this

unspecific proposal.  (*See, e.g.*, AR Doc. 574 at D-02-785 (discussing model which "attempts to

operationalize the proposed Oceana alternatives").)  The Council identified Alternative 7's closure

areas based on "low scallop productivity and high EFH importance" as defined by the habitat-

value-assigning model discussed herein at *supra* note 57.  (AR Doc. 138 at C1853).

Oceana criticizes the agency's methodology in developing Alternative 7, as it did

throughout the Amendment 10 process, and notes that the Habitat Technical Team also criticized

the model on which Alternative 7 was based.  (*See* Mot. at 39 (citing administrative record where

Oceana criticized Alternative 7); AR Doc. 19 at A1623 (Habitat Technical Team's criticisms).)[59/]

─────────────────────

[58/]As described by counsel for FSF, "what they're saying is close hard bottom areas and
then, of the remaining areas, close anything where there haven't been high scallop catches.  So
the Council staff develops an alternative to do that.  Lo and behold it closes 80 percent of the
ocean bottom.  And the Council in Amendment 10 said we don't want to do it after full notice
and comment and complete process."  (Tr. at 114-15)

[59/]The agency explained in response to Oceana's comments, "[T]he model has not been
endorsed by the Council's EFH Technical Team due to overall academic concerns.  However, the
outputs provided by the model for defining closed areas are better than the typical method of

Oceana also complains that "Alternative 7 was so over-inclusive as to be a political impossibility." (Reply at 32.)  Rather than focusing on low-productivity areas, as proposed, Alternative 7 impacted almost eighty percent of groundfish productivity and almost ninety percent of monkfish productivity.  (AR Doc. 138 at C1860 (Table 223).)  And, "only one percent of Alternative 7 was gravel hard bottom. . . .  That means 99 percent of it was closing the things Oceana did not ask to be closed."  (Tr. at 100.)  Thus, plaintiff argues, this alternative did not achieve results similar to those proposed by Oceana.

The Court agrees that Alternative 7 perhaps did not successfully execute the proposal to protect sensitive habitat areas with the least impact on scallop productivity.  As plaintiff convincingly argues, it was both overinclusive and underinclusive and did not specifically consider either hard-bottom areas or those areas used by overfished species.  (Reply at 31-32.)  However, the agency's failure to successfully put Oceana's proposal into effect does not represent a NEPA violation.  No doubt the proposal was an obvious and reasonable one -- it is nearly synonymous with the statutory goal of minimizing adverse effects on EFH to the extent practicable.  But any number of alternatives might have satisfied Oceana's broadly-worded proposal to protect vital habitat areas while avoiding areas of high productivity.  Given the overbreadth of the proposal, the difficulties involved in "operationalizing" such a proposal, and the agency's duty to consider the

_____

randomly and arbitrarily drawing a box on a map.  In addition . . . the Council was aware of the reservations [of] the EFH Technical Team but chose to include the alternatives in the [Draft EIS] so that full public comment regarding the alternatives could be received."  (AR Doc. 574 at D-02-785.)

practicability of habitat measures, the Court cannot fault the agency for refusing to incorporate the alternative as envisioned by Oceana.[60/]

In sum, the Court cannot agree that NEPA required defendant to consider even more alternatives so as to properly execute those proposed by Oceana.  Where the agency relies upon its scientific expertise, the Court's role is to assure that it has met "certain minimal standards of rationality" in designing a reasonable range of alternatives.  *AOC*, 183 F. Supp. 2d at 12 (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976).)  By considering Oceana's concerns as to sediment types, the habitat needs of overfished species, and productivity tradeoffs, and by designating a range of options based in part on these variables and in part on its expert assessment of alternative management methodologies for protection of EFH, as well as "practicability" concerns,  NMFS has met this standard.   The agency's extensive analysis over hundreds of pages of the pros and cons of each habitat measure demonstrated the varying degrees of environmental benefits each afforded and provided sufficient information to permit a "reasoned choice."  *Cf. CLF v. Mineta*, 131 F. Supp. 2d at 29 (NMFS's nine-page EFH analysis for Scallop Framework 13 was sufficient under NEPA).

---

[60/]Furthermore, although Alternative 7 failed to present the scenario Oceana had in mind, that does not mean that the envisioned trade-off was not reflected in other alternatives in the agency's chosen range.  As noted by defendants, Alternative 5 also aimed "to evaluate optimal area closure configurations to optimize the tradeoff between EFH protection and losses in resource productivity. . . ." (Defs.' Opp'n at 39.)  While the predominant sediment types in Alternatives 5a-d are sand and mud (AR Doc. 138 at C1830 (Table 202)), rather than hard bottom, these alternatives nevertheless ranked among the highest for their effectiveness in protecting highly vulnerable EFH for overfished species.  (*Id*. at 1842 (Table 214).)  Thus, though Oceana defines EFH protectiveness differently, this alternative represented one reasonable option for balancing productivity and protectiveness.

V.      **Framework Actions**

Plaintiff claims that Amendment 10 has unlawfully transferred certain "fundamental policy decisions" from the realm of plan amendments to the abbreviated process of framework adjustments.  (Reply at 24.)  Before reaching the merits of this claim, the Court must address defendants' argument that it is procedurally barred.

A.      **Plaintiff's Claim is Not Procedurally Barred**

1.      **Collateral Estoppel**

Defendants argue that the doctrine of collateral estoppel bars plaintiff's claim because it litigated the same issue in *CLF I*, 229 F. Supp. 2d 29, in which the district court in Massachusetts upheld Framework 14 to the Scallop FMP.  But that case concerned the issue of whether framework "actions" were equivalent to "regulations" and were therefore subject to the MSA's notice and comment procedures, not whether the Secretary had authority to make significant changes through framework actions.  *See, e.g., id.* at 32 ("Whether the Secretary, despite custom and practice, is required . . . to publish *any* interim change to a [FMP] as a 'proposed regulation' is at the core of the parties' dispute.") (emphasis added).  Although the First Circuit reviewed *CLF I* to determine whether the framework "'was consonant with [the agency's] statutory powers,'" the extent to which management measures could be implemented by framework actions was never raised.  *CLF II*, 360 F.3d at 27 (quoting *Associated Fisheries of Maine*, 127 F.3d at 109) (alteration in original).  The issue in the First Circuit was the validity of Frameworks 14 and 15, not Amendment 10 or Framework 16, and moreover, the agency has now authorized an even broader array of possible "actions" than were at issue in *CLF I* and *II*.  The Court therefore concludes that the issue in *CLF I* was not "precisely the same" and as a result, does not preclude this litigation.

*Nuclear Energy Inst., Inc.*, 373 F.3d at 1303.

## 2. Statute of Limitations

Nor is plaintiff's claim time-barred. Defendants argue that plaintiff should have challenged Amendment 4, which initially authorized framework adjustments, thirty days after its promulgation in 1994. Amendment 10, however, added a number of items to the list of measures that may be changed through the framework process, thereby "reopening" the issue for purposes of the statute of limitations. *Compare, e.g.*, *Midwater Trawlers Co-Op v. Mosbacher*, 727 F. Supp. 12 (D.D.C. 1989) (challenge to TAC was not timely because issue of optimal yield had *not* been reopened). Oceana timely challenged the framework provisions in its comments on the Amendment 10 proposed rule (*see* AR Doc. 1270 at D-04-616-17), and therefore, there is no bar to plaintiff's asserting this claim.

## B. Statutory Background

The MSA specifically authorizes several types of agency actions: FMPs (and amendments thereto),[61] 16 U.S.C. § 1801(b)(4); regulations "deem[ed] necessary or appropriate" to implement FMPs, *id.* § 1853(c); and emergency actions, *id.* § 1855(c). FMPs are subject to a sixty-day public comment period and, subsequently, a thirty-day period for agency approval. *Id.* § 1854(a). Regulations necessary to implement the FMP must be submitted for publication simultaneously

---

[61]FMPs and amendments are governed by the same procedural standards. *See, e.g.*, 16 U.S.C. § 1854(a). This Memorandum Opinion refers to both FMPs and FMP amendments as "FMPs."

with the FMP (and may be submitted to modify the FMP at a later date) and are also subject to notice and comment. *Id.* §§ 1853(c), 1854(b).

Since the early 1980s, regional fishery councils have been using "framework adjustments" in place of "cumbersome" plan amendments (Defs.' Opp'n at 8) to "expeditious[ly] respon[d] to changing conditions in fish populations." *Roche v. Evans*, 249 F. Supp. 2d 47, 59-60 (D. Mass. 2003) (upholding enforcement of closure defined by framework action). As described in a set of informal guidelines issued in 1982, framework actions were intended to allow "changes and adjustments" to the management regime within a few months, whereas FMP amendments took nearly a year to complete. (*See* Defs.' Opp'n at 8 & Ex. 1 at 2.) Since that time, regional councils have adopted some type of framework process for most fisheries throughout the country. (*See* Defs.' Opp'n at 8 (citing regulations establishing framework processes).)

Framework actions are not subject to the MSA's notice and comment requirements and escape a number of other constraints as well. *See, e.g.*, *CLF I*, 229 F. Supp. 2d at 33-34 & 34 n.11 (implementation of scallop Framework 14 did not trigger fifteen-day public comment period and MSA's requirement that FMP contain measures to minimize adverse effects on habitat does not apply to framework adjustments if a plan is already in place); *Roche*, 249 F. Supp. 2d at 57 (the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq*., does not apply to the adoption of a framework adjustment). The APA's notice and comment provisions apply but can be waived for "good cause" if it would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

In 1990, Congress amended the MSA to expand its judicial review provisions. Pub. L. No. 101-627, 104 Stat. 4436 (Nov. 28, 1990). In this amendment, Congress acknowledged the

existence of framework-type measures for the first time.  The 1990 amendment established judicial

review of "actions that are taken by the Secretary under regulations which implement a fishery

management plan, including but not limited to actions that establish the date of closure of a fishery

to commercial or recreational fishing."  16 U.S.C. § 1855(f)(2).[62/]  Because it refers both to

"regulations" and "actions described in paragraph (2)," courts have found that the statute "draws a

clear distinction between regulations promulgated by the Secretary and actions that are taken by the

Secretary implementing a [FMP]."  *CLF I*, 229 F. Supp. 2d at 33 (internal quotation marks and

alterations omitted).  However, the statute does not further define the term "action."

The statute requires, however, that FMPs "shall" contain certain provisions.  16 U.S.C.

§ 1853(a).  For example, in addition to the bycatch provisions discussed in Section III *supra*, FMPs

must "assess and specify . . . optimum yield."  16 U.S.C. § 1853(a)(3).  Among other requirements,

they must also "describe and identify essential fish habitat . . .[,]  minimize to the extent practicable

adverse effects on such habitat caused by fishing, and identify other actions to encourage the

conservation and enhancement of such habitat."  *Id.* § 1853(a)(7).  The MSA also provides that

FMPs "may" include a broad range of "discretionary measures."  *Id.* § 1853(b).  In addition to the

specific examples listed in the statute, FMPs may "prescribe such other measures, requirements, or

---

[62/]Section 1855(f) states in pertinent part:

(f) Judicial Review

(1) Regulations promulgated by the Secretary under this chapter and
actions described in paragraph (2) shall be subject to judicial review . . .

(2) The actions referred to in paragraph (1) are actions that are taken by the
Secretary under regulations which implement a fishery management plan,
including but not limited to actions that establish the date of closure of a fishery to
commercial or recreational fishing.

conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(12).

Over the years, courts have implicitly accepted that many fishery management measures are commonly enacted by framework action. *See, e.g., CLF v. Mineta*, 131 F. Supp. 2d at 21 (reopening of closed areas and DAS allocations); *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1419 (M.D. Fla. 1998) (quotas and trip limits); *Strahan v. Coxe*, 939 F. Supp. 963, 990 n.46 (D. Mass. 1996), *aff'd in part and vacated in part on other grounds*, 127 F.3d 155 (1st Cir. 1997) (gear restrictions); *Northwest Envt'l Defense Ctr. v. Gordon*, 849 F.2d 1241, 1243 n.2 (9th Cir. 1988) (allowable ocean harvest levels and quotas, size and daily bag limits, gear restrictions, and season dates); *CLF II*, 360 F.3d at 28 (DAS allocations and area closures). Despite the long history of this approach, the instant case appears to be the first time the very establishment of "frameworkable" measures-- rather than the lack of MSA notice and comment or the substance of a framework action itself-- has been challenged as contrary to congressional intent.

### C. Framework Adjustments to the Scallop FMP

In 1994, the Council issued the final rule for Amendment 4 to the Scallop FMP, initiating a framework adjustment process in which a number of management measures could be changed without a plan amendment. 59 Fed. Reg. 2757, 2776-77 (Jan. 19, 1994), *codified at* 50 C.F.R. § 648.55. The Council may recommend framework adjustments in response to the Plan Development Team's assessment of an annual report submitted by the Regional Director on the "status of the sea scallop resource," or on its own initiative. (*Id.* at 2777.) Under Amendment 4, recommended changes or additions to management measures had to come from one or more of the following categories:

- 73 -

> (1) DAS changes; (2) Shell height; (3) Offloading window re-instatement;
> (4) Effort monitoring; (5) Data reporting; (6) Trip limits; (7) Gear
> restrictions; (8) Permitting restrictions; (9) Crew limits; (10) Small mesh
> line; (11) On board observers; (12) Any other management measures
> currently included in the FMP.

*Id.* Development of management measures must take place over the course of at least two Council

meetings, and the rule requires the Council to provide the public with advance notice of its

proposals and analyses, and with an opportunity to comment prior to and at the second Council

meeting.[63]  *Id.*  The Council may recommend to the Regional Administrator that the agency

publish the action as a final rule instead of first publishing it as a proposed rule for public

comment.  In that case, the Council must scrutinize the action further.  *Id*; 50 C.F.R § 648.55(i).  If

the Regional Administrator approves the Council's recommended management measures, the

Secretary may either waive the public comment requirement for good cause pursuant to the APA

and publish only the final rule, or publish the action as a proposed rule and receive public

comment.  *Id.* § 648.55(j).  Either way, scallop fishery framework actions are eventually published

as rules and become part of the Code of Federal Regulations.

The Secretary issued fifteen framework adjustments under the regime established by

Amendment 4.  Plaintiff and Conservation Law Foundation challenged Framework 14 for failure to

comply with the MSA's public comment requirements for regulations that implement or amend an

FMP.  *See CLF I*, 229 F. Supp. 2d at 32.   Although framework adjustments under 50 C.F.R.

§ 648.55 are "regulations" in that they are published in the Code of Federal Regulations, the First

Circuit found that Framework 14 was an "action" under the Scallop FMP regulations, as

---

[63]/Thus, plaintiff's suggestion that framework actions are akin to "decree[s]" from on high
is not accurate.  (Mot. at 35.)

contemplated by § 1855(f) of the MSA, rather a formal "regulation" that implements or amends an

FMP under § 1853(c).  Thus, the agency had not erred by failing to comply with the notice and

comment procedures that apply to § 1853(c) regulations.  *CLF II*, 360 F.3d at 29.

Amendment 10 expands on the management regime adopted in Amendment 4, adding a

number of new "frameworkable" actions to 50 CFR § 648.55, and changing the regular review of

management measures from a one-year to a two-year schedule.  But before one can examine the

framework provisions in detail, some explanation of Amendment 10's general objectives is

appropriate.  Amendment 10 introduces a new management regime to the scallop fishery --

"rotation area management."  (AR Doc. 138 at 1224.)  Rather than closing areas to scallop vessels

permanently, this approach aims to close areas where young, fast-growing scallops are, and to

reopen these areas when the scallops mature.  The goal of this new approach is to boost the

productivity of the fishery.  *Id.*  The Amendment sets out detailed policies and guidelines to inform

the Council's decisions on what areas it should close or reopen and when these changes should

occur.  (AR Doc. 138 at 1214-29 (describing "a planned set of criteria or guidelines that would

regularly close areas to fishing when small scallops are more abundant than large scallops . . .").)

The final rule contains "no pre-defined conditions for area closures and reopenings, except that

areas will close when the expected increase in exploitable biomass in the absence of fishing

mortality exceeds 30 percent, and areas will re-open when the expected annual increase in the

exploitable biomass in an area is less than 15 percent."  69 Fed. Reg. at 35196.  Thus, Amendment

10 depends on the Council's ability to make management changes based on where young scallops

are found at any particular time.  (*See id.* ("This area rotation program is based entirely on

changing conditions of the scallop resource.").)  According to defendants, the framework process is

necessary because management measures will "require constant adjustment based on evaluation of

incoming data or reports." (Defs.' Opp'n at 35.) For example, the Amendment explains that target

fishing mortality rates must be adaptable to the rotational closure system, which puts a varying

percentage of the scallop stock off-limits at any one time and results in increased pressure on the

areas that remain open. (*Id.* at C1204, C1360.)

Amendment 10 requires the Plan Development Team to prepare a biennial Stock

Assessment and Fishery Evaluation ("SAFE"), which will review existing management measures

to determine if they are achieving the FMP objectives and optimum yield. Based on this analysis,

the Council will initiate framework adjustments "to achieve plan objectives . . . [,] limit fishing

mortality," and "assure that optimum yield is achieved on a continuing basis." (AR Doc. 138 at

C1250.) In addition to the measures identified in Amendment 4, the Council may adopt the

following additional measures by framework action:

> Size and configuration of rotational management areas; controlled access
> seasons to minimize bycatch and maximize yield; area-specific DAS or trip
> allocations; amount and duration of TAC specifications following
> reopening; limits on number of closures; TAC or DAS set-asides for funding
> research; priorities for scallop-related research that is funded by a set-aside
> from scallop management allocations; finfish TACs for controlled access
> areas.

69 Fed. Reg. at 35197-98. The revised regulations also include "modification of the overfishing

definition" as a measure that may be adopted by framework. *Id.* at 35219. Finally, under the

"Proactive Protected Species Program," the Council may use the framework process to "close

areas, establish seasons, implement gear modifications, or implement other measures . . . to reduce

the risk of takes of sea turtles and other species protected under the [ESA]. . . ." *Id.* at 35198.

Subsequent to Amendment 10, the Council issued a joint framework adjustment--

Framework 16/39 ("Framework 16")-- covering both the scallop fishery and the groundfish fishery without waiving the APA notice and comment requirements.  69 Fed. Reg. 63460 (Nov. 2, 2004); *see supra* Section IV.  One purpose of the Framework was to "correct the inconsistencies" between the Scallop and Groundfish FMPs.  (FW16 AR Doc. 144 at B445.)  The Framework explains that "[d]ue to timing," a late-arriving habitat closure alternative considered and chosen for Amendment 13 to the Groundfish FMP could not be included in the alternatives considered for Amendment 10 to the Scallop FMP.  (*Id.* at B472.)  According to the Council, implementation of both the closures identified in Amendment 10 and those identified in Amendment 13 would have caused "impracticable restrictions on scallop fishing."  (*Id.*)  To resolve the discrepancy, Framework 16 replaced the scallop Alternative 6 with the groundfish Alternative 10(b).[64]

## E.      Analysis

Plaintiff's claim can be broken down into two issues: (1) is Amendment 10's delegation of certain types of FMP adjustments to the "framework action" process delineated in 50 C.F.R. § 648.55 unlawful on its face?; and (2) is Framework 16's modification of the Amendment 10 habitat closures an unlawful application of the agency's authority?  As to the first question, the parties do not dispute that framework actions are an appropriate tool for at least some types of management measures.  (*See* Reply at 27, 25 n.18.)  *See generally CLF I*, 229 F. Supp. 2d at 32 (Secretary need not publish all interim changes to FMPs as proposed regulations subject to MSA's public comment requirements).  Rather, the question is *to what extent* the Secretary and NFMS may delegate their duties to the framework adjustment process.  Plaintiff argues that only "minor"

---

[64]The Framework also established the first rotational access areas for the new management program proposed by Amendment 10, but plaintiff does not challenge this action. (*See* Tr. at 85.)

or "ministerial" changes may be effected through framework actions and that Amendment 10, in contrast, leaves core measures -- "the heart of fisheries management" -- to the framework adjustment process.  (Mot. at 36.)  *See* 69 Fed. Reg. at 35197-98 (listing Amendment 10's litany of "frameworkable" actions) (*reproduced supra* Section V(D)).  Defendants respond that Amendment 10  already includes all statutorily required provisions, and since the the statute allows for a broad range of discretionary framework adjustments, Amendment 10's provisions regarding permissible framework actions are lawful under the MSA.  According to defendants, the framework process is merely an "*additional*" aspect of Amendment 10 (Defs.' Opp'n at 31 (emphasis in original)), which is necessary to manage fisheries "on an ongoing basis," *see, e.g.*, 16 U.S.C. § 1801(a)(5), and to execute Amendment 10's particularly time-sensitive approach.  *See supra* Section V(D).

Plaintiff relies on the MSA's mandate that FMPs "shall" include certain management measures, 16 U.S.C. § 1853(a), and claims that the types of measures that can be adopted by framework (instead of by FMP) under Amendment 10 violate the requirements of § 1853(a).  (*See* Mot. at 35, Reply at 26-27.)  For example, plaintiff argues that because the statute requires FMPs to contain "the extent to which fishing vessels of the United States . . . will harvest the optimum yield", *id.* § 1853(a)(4), Amendment 10's provision that TAC quotas may be set by framework runs afoul of this provision.  (*See* Mot. at 35-36.)

Based on the FMP requirements set forth in § 1853(a), plaintiff asserts that Amendment 10 unlawfully allows framework adjustments for (1) TAC levels and the management measures used to obtain them, (2) management measures to take into account adverse impacts on EFH, (3) modification of the overfishing definition, (4) controlled-access seasons to minimize bycatch,

(5) finfish TACs and possession limits, and (6) sea sampling (*i.e.*, observer) frequency.  (Mot. at

34-35; Tr. at 95.)  *See* 16 U.S.C. §§ 1853(a)(11); (a)(4); (a)(7).

Defendants and FSF rely on § 1855(f) to argue that Congress acquiesced in the agency's

longstanding practice of implementing management measures through framework actions.  The

agency does not define the appropriate scope of framework actions, but interprets the statute to

allow discretionary, as well as ministerial measures, if needed to "achieve FMP objectives and

limit fishing mortality."  50 C.F.R. § 648.55.  To support this position, defendants point out that

Congress requires NMFS to adjust management measures on a "continuing basis," which suggests

that Congress intended the agency to respond to new information relatively quickly.  *See* 16 U.S.C.

§ 1801(a)(5) (recognizing the need for "sound management  . . . to provide optimum yields *on a

continuing basis*"); § 1801(b)(4) (FMPs "will achieve and maintain, *on a continuing basis*, the

optimum yield from each fishery"), § 1851(a)(1) (requiring "[c]onservation and management

measures" that "prevent overfishing while achieving, *on a continuing basis*, the optimum yield

from each fishery") (emphasis added).  Especially in the context of Amendment 10's dynamic

management plan, defendants claim that "where Congress has charged an agency with the

considerable task of continually changing the management regime, NMFS should be afforded

deference to fashion its own processes in order to discharge this continuing duty."  (Defs.' Opp'n

at 35.)  As in *CLF I*, "Congress may . . . well have believed that there was some value in expediting

the implementation of adjustments to a [FMP] . . . particularly in light of the vagaries inherent in

managing a complex and volatile ecosystem."  229 F. Supp. 2d at 33.

The Court concludes that the spectrum of permissible framework actions falls somewhere

between plaintiff's very narrow definition and the exceedingly broad one proposed by defendants.

Despite the government's confidence that the language of § 1855(f)(2) authorizes a seemingly

limitless range of framework actions, this section merely suggests that Congress acknowledged

their use for *some* types of measures (the only example given is an action "to establish the date of

closure of a fishery") and provided for judicial review of those actions.  *Id.*  While the statute's use

of the phrase "including, but not limited to," leaves the term "action" undefined, it is not without

bounds.  Congress' desire that fisheries be managed on a continuing basis cannot be read to

eviscerate the legislature's equally strong desire that policy choices be determined with ample

public participation, 16 U.S.C. § 1801(b) (declaring that one purpose of statute is to establish

Councils to prepare plans "under circumstances . . . which will enable the States, the fishing

industry, consumer and environmental organizations, and other interested persons to participate in,

and advise on, the establishment and administration of such plans . . . ."), and its mandate that

certain features of fisheries management regimes *must* be specified by FMP.  *Id.* § 1853(a).  *See*

*also Oceana I*, 2005 WL 555416, at *40 (statute prohibits total delegation of the "required

provisions" of FMPs); *see also PMCC*, 200 F. Supp. 2d at 1200 (finding FMP inadequate because

"NMFS in theory could decide not to implement an observer program for the ground fishery, and

nothing in Amendment 13 would prohibit the agency from making that decision.").

It is also clear that Congress contemplated that non-FMP changes to a management regime

would be initiated to "implement" an FMP and its corresponding regulations, rather than to

propose new management measures.  16 U.S.C. § 1855(f).  *See also CLF I*, 229 F. Supp. 2d at 33

("Congress may . . . well have believed that there was some value in expediting implementation of

*adjustments* to [an FMP] whose implementing regulations were already in place . . . .") (emphasis

added).  Thus, an FMP must "specify" mandatory governing principles as required by § 1853(a),

but the Council and NMFS may undertake a range of actions to carry out those principles in response to updated data about the fishery.[65/]

The question is thus the same as that posed in Section III, *supra*: does Amendment 10 contain the FMP components in sufficient detail to meet the requirements of § 1853(a), or does it express mere "intent" and defer the key decisions to the framework process? *See Oceana I*, 2005 WL 555416, at *42. However, with the exception of Amendment 10's failure to establish a bycatch reporting methodology (addressed *supra* Section III) and its procedural failure to consider adequate alternatives under NEPA, plaintiff raises no issue as to the contents of Amendment 10. Instead, it directs its claim only towards Framework 16 and possible future frameworks that may be

---

[65/]These limitations on the proper scope of framework actions are consistent with the agency's own interpretation. The regulations codifying the framework process state that the Council "shall initiate a framework adjustment to establish or revise . . . measures *to achieve FMP objectives* and limit fishing mortality." 50 CFR § 648.55(a) (emphasis added). Likewise, the government's 1982 guidelines intended that frameworks would "implement[]" FMPs, not supercede them, stating:

> Whether a particular change may be made in the management of a fishery without formal amendment to an approved FMP depends on whether the change and its consequences have been described adequately in the FMP. If so, the Secretary is implementing provisions that have been subject to public scrutiny and comment in developing the FMP. If not, the Secretary's action could be considered arbitrary and capricious and could fail a legal challenge.

(Defs.' Opp'n, Ex. 1 at 1-2.)

That some discretion is permitted in framework actions does not mean the agency may rule by "decree," as feared by plaintiff. (Mot. at 35.) The Secretary is still subject to the APA's notice and comment requirements, which are far from meaningless. *See, e.g., NRDC v. Evans*, 316 F.3d 904, 912 (9th Cir. 2003); *Envtl. Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir. 1983) ("Any claim of exemption from APA rulemaking requirements [under the 'good cause' exception] will be narrowly construed and only reluctantly countenanced."). *See also supra* note 63 and accompanying text.

enacted pursuant to Amendment 10.[66]

Given the speculative nature of plaintiff's challenge to Amendment 10's frameworking

authority (as opposed to Framework 16 itself), and the impossibility of predicting the contents of

any future framework or the factual circumstances surrounding its adoption, the Court must

consider whether this claim is ripe.  "Federal courts are limited by Article III of the Constitution to

deciding 'Cases' and 'Controversies,' and by prudential considerations, which the court may raise

*sua sponte*."  *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003).  The "basic

rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect agencies from judicial interference until an administrative decision has been

formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v.

Gardner*, 387 U.S. 136, 148-49 (1967).  In deciding whether a challenge to an agency's decision is

ripe for review, the Court examines the "'fitness of the issues for judicial decision and the hardship

to the parties of withholding court consideration.'"  *Nat'l Ass'n of Home Builders v. U.S. Army

Corps of Eng'rs*, 2005 WL 1789740, at *7 (D.C. Cir. July 29, 2005) (quoting *Village of

Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004)).  Further, the Court determines whether

---

[66]*See* Tr. at 88 ("THE COURT: [I]t is not Amendment 10 here that is being attacked
other than the bycatch . . .  they have in there, you concede, an EFH plan, an overfishing plan and
optimum yield.  It's there but you are objecting to the notion that they permit some kind of
adjustment to it.  MR. BILSKY: Exactly.  Exactly."); 75 ("THE COURT: They haven't used the
power [to implement framework adjustments] in some instances, right?  But the fact that . . . it's
been delegated and may potentially be used is your objection?  MR. BILSKY: That it may
potentially be used and that it is in fact used in Framework 16, which we challenge in this
case.").)  (*See also* Mot. at 30 ("While the agency developed [FMP] amendments to address the
overfishing and [EFH] components of the [SFA], it never developed a [FMP] amendment to
address the Act's bycatch reporting requirements.").)

an issue is fit for judicial review by deciding "whether the issue presented is purely legal, whether

consideration of the issue would benefit from a more concrete setting, and whether the agency's

action is sufficiently final." *Her Majesty the Queen ex rel. Ontario v. EPA*, 912 F.2d 1525, 1532

(D.C. Cir. 1990).

While "a purely legal claim in the context of a facial challenge" is "'presumptively

reviewable,'" *Nat'l Ass'n of Home Builders*, 2005 WL 1789740, at *7 (quoting *Nat'l Mining Ass'n

v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)), the D.C. Circuit has cautioned that sometimes

"even purely legal issues may be unfit for review." *Atl. States Legal Found.*, 325 F.3d at 284.  In

some cases, "too many imponderables" may warrant delaying review until there has been further

factual development. *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205 (D.C. Cir.

1998) (declining to consider whether EPA's alteration of permissible testing methods changed

Clean Air Act standards).  Moreover, the Supreme Court has rejected "wholesale" challenges to

"broad regulations" before "the scope of the controversy has been reduced to more manageable

proportions, and its factual components fleshed out, by some concrete action applying the

regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v.

Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (noting exception where the rule requires the

claimant to "adjust his conduct immediately"). *See also Nat'l Ass'n of Home Builders*, 2005 WL

1789740, at *9 (distinguishing *Lujan* because challenged action (*i.e.*, an Army Corps of Engineers'

regulation rejecting a "hard and fast test" for whether an activity causes "discharge" under the

Clean Water Act and instead relying on case-by-case determinations) required immediate change in

conduct).

Based on these principles, the Court concludes that plaintiff's challenge to the framework process outlined in Amendment 10 is not yet fit for judicial review.  Amendment 10 describes only a range of options by which the agency may respond to changes in the scallop resource and the procedure by which it must do so, and to date, very few of those options have been exercised. Depending on the nature of a future framework action, the measure may comport with or exceed the agency's authority under the contours of the MSA, as outlined above.  A framework adjustment that truly adjusts management measures according to specifications in the FMP might well be lawful, whereas so-called adjustments which in fact undermine or contravene key provisions of an FMP would not.  For example, plaintiff challenges the provision of Amendment 10 that allows the Council to adjust "sea sampling," or observer coverage, but admits that if on remand, the FMP is modified "in a very precise manner, [to] set out some tests that could be applied in a more or less ministerial way," then adjustments to the sea sampling regime by framework action would be permissible.  (Tr. at 97.)  Thus, without knowing what the FMP will look like on remand, and having determined that *some* types of framework actions are permissible under the statute, the Court cannot engage in hypothetical line-drawing to define exactly what framework actions regarding sea sampling will be unlawful.

The same can be said for Amendment 10's authorization of framework actions for TAC limits, modification of the overfishing definition, controlled-access seasons to minimize bycatch, and finfish TACs and possession limits.  The Court is simply not in a position to know if Amendment 10 has unlawfully delegated an excessive amount of authority to the framework process, especially where this authority has yet to be exercised, and may, for all we know, not be

used for many of the listed measures.  Thus, as in *Lujan*, further factual development through some "concrete action" is necessary.  497 U.S. at 891.

Nor will plaintiff suffer any particular hardship in waiting to challenge framework actions as they arise.  Amendment 10 does not require Oceana "to engage in, or to refrain from, any conduct," *Texas v. United States*, 523 U.S. 296 (1998), and plaintiff does not identify any other imminent harm, such as an upcoming framework adjustment that it expects will fall outside the parameters of the agency's authority.  *Clean Air Implementation Project*, 150 F.3d at 1206 ("The burden of participating in future proceedings does not 'constitute sufficient hardship for the purposes of ripeness.'" (quoting *Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998)).)  Although the agency has indicated that it will issue new framework adjustments at least every two years in response to new data, 50 C.F.R. § 648.55, at this time the Court has no way of predicting whether such adjustments will violate the statute.

The Court now turns to the second issue, the lawfulness of Framework 16.  Plaintiff claims that the Council violated the MSA by enacting habitat closures by framework action because the statute requires that an FMP must include measures to "minimize to the extent practicable adverse effects on [EFH] caused by fishing . . . ."  16 U.S.C. § 1853(a)(7).  As discussed *supra* Section IV, Amendment 10 took steps to comply with this statutory requirement.  However, Framework 16 nullified one aspect of Amendment 10's habitat protection measures, supplanting the designated habitat closures with those of Amendment 13 to the Groundfish FMP.  One the one hand, the new habitat closures, like the old, are the product of extensive deliberation and public participation with regard to Amendment 13.  *See Oceana I*, 2005 WL 555416, at **28-37.  On the other hand, as argued by plaintiff, Framework 16 "just wipes by the board all the work done for Amendment 10

- 85 -

on habitat." (Tr. at 83.)  Though Oceana fully participated in the development of habitat measures

with respect to groundfish gear, Framework 16 undermined its participation with respect to habitat

closures for scallop gear.  *See supra* Section IV(B)(3).  And, as plaintiff argues in response to

defendants' statement that Framework 16 merely corrected an inconsistency, "there was no

requirement to make it consistent and there was no formal inconsistency.  What there was [was]

two sets of closures. . . ."  (Tr. at 83.)  The question that must therefore be decided is whether the

Secretary has authority to invalidate closures established by Amendment 10 by framework action.

Framework adjustments are intended to respond to new data, to ensure that the fishery

achieves optimum yield on an ongoing basis, and "to achieve FMP objectives." 50 C.F.R. § 48.55.

And, as previously discussed, both the statute and the agency's own internal guidelines

contemplate "actions" that *implement* an FMP, but do not fundamentally alter it.  For example, the

guidelines explain:

> [I]t is likely that changes in regulating a fishery will require an amendment
> to the FMP when these: . . .introduce a new concept into the management of
> the fishery or eliminate or radically change an existing one [. . . or] alter
> management of the fishery in a way, or to an extent, not considered in the
> FMP or prior amendments, or in hearings held during their preparation.

(Defs.' Opp'n, Ex. 1 at 2.)

To ignore these constraints would be to grant a *carte blanche* to the agency to do an end-

run around the public comment procedures laid out in the MSA.  Though defendants' key

justification for the need for framework actions is that the agency must be able to respond to new

data quickly, especially in the context of Amendment 10's time-sensitive management regime (*see*

Defs.' Opp'n at 35), the habitat measures in Framework 16 were not enacted in response to

changing resource conditions or to achieve optimum yield "on an ongoing basis."  (*Id.*)  They were

- 86 -

enacted to correct a incongruity that resulted from the agency's own decision to treat habitat closures for scallops and groundfish in separate plan amendments, and they overturn, rather than implement, the corresponding FMP provisions.  Consequently, this measure cannot be subsumed within the category of an "action" taken "under" an FMP regulation.  16 U.S.C. § 1855(f).  *See generally Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (agency may not disregard congressional intent clearly expressed in statute simply by asserting that its preferred approach would make better policy).  The Court's conclusion does not affect the agency's ability to implement this change under its authority pursuant to § 1853(c), which allows the Secretary to make "modifications" to an FMP after its approval.  *Id.*  The only difference is that these modifications are subject to the notice and comment provisions of § 1854(b), whereas framework "actions" are not.

Insofar as Framework 16's habitat measures are inconsistent with the Secretary's authority under the MSA, the Court must vacate those provisions.  Again, since the habitat closure provisions are severable from the rest of Framework 16, the Court need not vacate the other parts of the Framework, which designate controlled access areas for the scallop fishery.  The practical result of the Court's holding is that, for the time being, both the habitat closures in Amendment 10 and the habitat closures in Amendment 13 will remain in place.  If the agency still deems it necessary to resolve this inconsistency, it must do so through lawful procedures.[67]

---

[67]In fact, the Council's statement that it plans to develop a comprehensive EFH management plan by omnibus amendment that will apply to all Council-managed FMPs indicates that it is already on its way to resolving this issue.  (FW16 AR Doc. 144 at B493-94.)

**CONCLUSION**

The Court grants summary judgment in favor of defendants with two exceptions.  The

Court finds that Amendment 10 violates the bycatch reporting provisions of the SFA and therefore

remands this aspect of the Amendment to the agency for further action consistent with this

Memorandum Opinion.  Further, Framework 16's elimination of the Amendment 10 habitat

closures, insofar as they are inconsistent with those of Amendment 13, violates the MSA and is

therefore vacated.  Because the Court finds no violation of the ESA, nor any other basis for

injunctive relief, plaintiff's request for permanent injunctive relief is denied.  An appropriate Order

accompanies this Memorandum Opinion.


_____
                                    s/
                            ELLEN SEGAL HUVELLE
                            United States District Judge


Date:    August  2, 2005