UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OCEANA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-0810 (ESH) |
| | ) | |
| DONALD L. EVANS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

On August 2, 2005, this Court held that the United States Fish and Wildlife Service ("FWS") lacked statutory authority to promulgate Framework 16 to the Scallop Fishery Management Plan insofar as it undid the habitat closure areas that had been established by Amendment 10 to that Plan. *Oceana, Inc. v. Evans*, 2005 WL 1847303, *42 (D.D.C. Aug. 2, 2005). The Court therefore vacated those parts of Framework 16 that modified the Amendment 10 closures and stated that "for the time being . . . the habitat closures in Amendment 10 . . . will remain in place." *Id.* at *43. The federal defendants have filed a Motion for Clarification, and defendant-intervenor has filed a Motion to Alter or Amend Judgment. For the reasons stated below, the Court concludes that it need not disturb its prior holding and that the Amendment 10 closures were automatically reinstated as a result of the Court's August 2 Order.

**I.      Federal Defendants' Motion for Clarification**

Defendants seeks clarification as to whether, in addition to vacating the portions of Framework 16 that eliminated the habitat closures established by Amendment 10, the Court

reinstated the Amendment 10 closures, or whether the agency must repromulgate Amendment 10 closures. Because this issue was not briefed by the parties, the Court did not have the opportunity to thoroughly consider it, but stated that the practical result of its ruling was that Amendment 10 would remain in place. *Id.*

Defendants take the position that this statement was in error because when the Court vacates an agency's rule, the agency "cannot automatically revert back to superseded regulations, but instead is left with a regulatory vacuum." (Defs.' Mot. at 2.) In support of this position, they cite *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983), in which the D.C. Circuit expressed a preference for "vacat[ing] the new rule without reinstating the old rule." *Id.* at 545. Though the Court of Appeals recognized that it had "sometimes assumed" that vacating a new rule would reinstate the old, it concluded that a "better course" generally would be to "leave[] it to the agency to craft the best replacement for its own rule." *Id.* (citing *Natural Res. Def. Council, Inc. v. Gorsuch*, 685 F.2d 718, 728 (D.C. Cir. 1982)).

Oceana argues that the government's position is neither an accurate representation of the law nor logically coherent. First, *Small Refiner* was not the last word on this subject. In a subsequent case, *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750 (D.C. Cir. 1987), the D.C. Circuit noted, in contrast to *Small Refiner*, that it had "previously held that the effect of invalidating an agency rule is to '*reinstat[e]* the rules previously in force.'" *Id.* at 757 (emphasis and alteration in original) (quoting *Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983)).[1] Though *Bowen* post-dated *Small Refiner* by four years, the Court made no attempt

---

[1] While defendants may be correct that the *Bowen* Court misunderstood the district court's intent to reinstate the rule previously in force (Defs.' Reply at 2-3), this does not detract from the Court of Appeals' interpretation of the law on this issue.

to reconcile the two cases.  In any event, *Small Refiner* makes clear that it expressed only a "general rule," the application of which depends on the facts of the case.  *Small Refiner*, 705 F.2d at 545.[2]

The instant case is easily distinguishable from *Small Refiner*.  There, the Court invalidated an interim rule regarding the lead content standard for gasoline because it was too strict.  Given that the old standard was even stricter, the Court reasoned that it would be "irrational" to order the agency to return to it rather than allowing the agency to choose a suitable replacement.  *Id.* at 545.  Here, since the validity of Amendment 10's closures has been litigated and upheld, *see Oceana*, 2005 WL 1847303, at **25-32, it would be perfectly rational to reinstate those closures.  Indeed, it would defy logic to hold otherwise once the Court determined that portions of Framework 16 were unlawful.  As Oceana correctly points out, "the relevant portion of Framework 16 is precisely its negative action of nullifying the Amendment 10 habitat closures.  The only way to reverse that nullification is to revive the Amendment 10 closures." (Opp'n at 3.)

Defendants' additional argument that "as a practical matter" the Court should not reinstate the Amendment 10 closures is not supported by the record.  (Defs.' Mot. at 4 n.3.) While defendants suggest that the closures would result in "negative economic impacts" ( *id*; *see*

---

[2] Moreover, numerous courts of appeals have stated that the effect of vacating a rule is generally to reinstate the rule previously in force.  *See Paulson v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *Cumberland Med. Ctr. v. Sec'y of Health and Human Svcs.*, 781 F.2d 536, 538 (6th Cir. 1986); *Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1985); *Bedford County Mem. Hosp. v. Health and Human Svcs.*, 769 F.2d 1017, 1024 (4th Cir. 1985); *DeSoto Gen. Hosp. v. Heckler*, 766 F.2d 182, 186 (5th Cir. 1985); *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985); *Lloyd Noland Hosp. and Clinic v. Heckler*, 762 F.2d 1561, 1569 (11th Cir. 1985).

Defs.' Mot., attach. [Kurkul Decl.]), the agency considered this question in Framework 16 and found that difference between the economic impacts of the Amendment 10 and Amendment 13 habitat closures together and those of the Amendment 13 closures alone would be "relatively negligible in both the short and long term." (*See* Framework 16 Administrative Record ["F16 AR"] Doc. 190 at B-1344.)  Although, as defendant-intervenor points out (FSF's Reply at 6), the Amendment 13-only option was estimated to "result in slightly higher landings," the Council concluded that "the differences in the fleet revenues, and the producer benefits (surplus) for these options are negligible because the scallop prices are expected to be somewhat higher for habitat alternative 3 [which includes both sets of closures]." (F16 AR Doc. 190 at B-1333-44.)

In short, while the government's effort to seek clarification is understandable given the apparently inconsistent rulings in this Circuit, the Court believes that its initial ruling should stand, the Amendment 10 closures should be reinstated, and NMFS need not repromulgate closure regulations.

## II.    FSF's Motion to Alter or Amend Judgment

Intervenor Fisheries Survival Fund ("FSF") has moved to alter or amend the Court's judgment pursuant to Fed. R. Civ. P. 59(e) .  FSF does not argue that the Court should reconsider its ruling on the basis of an intervening change in law or the availability of new evidence.  Thus, it must instead persuade the Court that there is "a need to correct a clear error or prevent manifest injustice." *Anyanwutaku v. Moore,* 151 F.3d 1053, 1057-58 (D.C. Cir. 1998) (internal citation and quotation marks omitted).  In doing so, it may not rely on arguments that could have been made at an earlier stage in the proceeding, *see Piper v. United States Dep't of Justice*, 312 F. Supp. 2d 17, 21 (D.D.C. 2004), for Rule 59 was not intended to allow a second bite at the

apple. *See Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993) (Rule 59 motions should not be "used by a losing party" to advance "a new defensive theory which could have been raised during the original proceedings.").

In the parties' cross-motions for summary judgment and at the hearing held on June 30, 2005, the Court was asked to decide whether FWS had the statutory authority to make certain changes to the FMP, including those made in Framework 16, by "framework action."[3] (*See* Pl.'s Mot. for Summ. J. at 32-36; Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 29-36; FSF's Opp'n to Pl.'s Mot. for Summ J. at 38 (noting that "the use of framework actions to adjust certain elements of the scallop management program, such as for . . . adjusting EFH protection measures . . . apparently causes Plaintiff legal harm because using such actions is said to offend the [Magnuson-Stevens Act]").)  The Court determined that Framework 16 exceeded the agency's statutory authority because it "overturn[ed], rather than implement[ed]" a key aspect of the corresponding FMP. *Oceana*, 2005 WL 1847303 at *42. Neither the statute's passing reference to "action[s]" taken "under" a regulation implementing an FMP nor the agency's internal guidelines on the use of the framework process permitted the use of an abbreviated public process for fundamental changes to the mandatory elements of an FMP. 16 U.S.C. § 1855(f)(2).

---

[3] The parties consistently focused on the issue of statutory authority. For example, at the June 30, 2005 motions hearing, counsel for FSF stated that "the authority to [promulgate frameworks pursuant to Amendment 10] is both contained within the regulation [laying out the procedure for issuing framework actions] and within 1853(b)(12)." (Tr. at 92; *see also id.* at 75 (statement by plaintiff's counsel that, "The problem is . . . the Agency gives itself carte blanche. It says look we can do anything. And the primary example of that is Framework 16 . . . ."); *id.* at 88-89 (the Court's statement to federal defendants' counsel that "[plaintiff's argument is] not procedural . . . He is arguing that [Amendment] 10 on its face allows a delegation by way of framework that is inconsistent with the statute. And, as a result, part of Framework 16 has got to go because that was not, that should have been part of the amendment . . . .").)

Now, at this late stage, FSF attempts to recharacterize Framework 16, arguing that it was not in fact a framework action, but was merely "mislabeled" as such. (FSF's Mot. at 7.) According to FSF, in promulgating Framework 16, FWS followed all the public notice procedures that would have been required for a "modification to [a] regulation implementing a fishery management plan or plan amendment" as envisioned by § 1853(c)(2). Because the Court referred to the possibility that FWS might accomplish a harmonization of habitat closures through this type of regulation,[4/] and, as FSF now claims, Framework 16 *was* this type of regulation, FSF argues that the Court's ruling was in error.

Not only is it too late to argue that Framework 16 is not actually a "framework," but the Court properly decided that the agency exceeded its statutory authority. The issue of whether an "implementing regulation" can modify habitat closures was not before the Court, and thus, to the extent the Court's opinion can be read to sanction such an action, the Court will amend its prior Memorandum Opinion to delete the two sentences referenced by FSF. *See supra* note 4. These comments were unnecessary to the Court's conclusion and, upon further consideration, may arguably be inconsistent with the Court's reasoning that the use of a "framework" violated the MSA in the circumstances presented. Whereas Amendment 10 contemplated using "frameworks" to designate rotational access areas and modify certain specified management measures in response to new data on the scallop resource and to "implement" the FMP, Framework 16 not only modified, but nullified the habitat closures established in Amendment

---

[4/]The Court stated that its conclusion that Framework 16 was improper did "not affect the agency's ability to implement this change under its authority pursuant to § 1853(c), which allows the Secretary to make 'modifications' to an FMP after its approval. The only difference is that these modifications are subject to the notice and comment provisions of § 1854(b), whereas framework 'actions' are not." *Oceana*, 2005 WL 1847303 at *42.

10, even though habitat closures were *not* one of the contemplated "frameworkable" measures.[5]
(*See* Pl.'s Opp'n at 12-13.)

      Nor can FSF demonstrate a "clear error of law" on the grounds that Oceana waived its challenge to Framework 16 by failing to submit comments on the proposed rule. (*See* FSF's Mot. at 8.) First, though FSF has long been aware that Oceana objected to Framework 16, as well as the framework process laid out in Amendment 10 (*see* Third Am. Compl. ¶¶ 335-38; *id.*, Prayer for Relief ¶ 7), FSF never raised Oceana's alleged failure to comment as a defense to Oceana's claims. Additionally, Oceana objected to the use of the Framework 16 as contrary to the agency's statutory authority, and not as a procedural violation. (*See id.*) Thus, FSF cannot argue that plaintiff should have objected specifically to Framework 16's proposal as to habitat closures by submitting comments on the proposed rule or has otherwise waived its challenge. Similarly, FSF's argument that Oceana's failure to show harm is unavailing, since the issue is is

---

[5] FSF's contention that the use of frameworks to alter habitat closures was clearly anticipated by Amendment 10 lacks support in the record. *See, e.g.*, Amendment 10 Final Rule, 69 Fed. Reg. 35194, 35198 (June 23, 2004) (stating that "changes in the following measures can be enacted through framework action: Size and configuration of rotational management closure areas; controlled access seasons to minimize bycatch and maximize yield; area-specific DAS or trip allocations; amount and duration of TAC specifications following reopening limits on number of closures; TAC or DAS set-asides for funding research; priorities for scallop-related research that is funded by a set-aside from scallop management allocations; finfish TACs for controlled access areas; finfish possession limits; sea sampling frequency; and area-specific gear limits and specifications" and making no mention of habitat closure areas). FSF relies on an Addendum to the Amendment 10 EIS which provides that the Amendment 13 habitat alternatives were "preferred." (FSF's Mot. at 15 (quoting Amendment 10 Administrative Record ["AR"] Doc. 918 at D-03-708).) However, as noted by plaintiff, "[t]he document does not warn the public that if Amendment 10 were to select a habitat alternative that established habitat closures, Framework 16 might be used to rescind that alternative in the future." (Opp'n at 14.) Furthermore, the document stated that the alternatives under consideration for Amendment 13 were "not viable alternatives that can be incorporated into Amendment 10 without further analysis and public comment comparable to the other alternatives." (*Id.* at 15 (quoting AR Doc. No. 138 at C2906).)

whether the defendant violated the MSA by enacting Framework 16, not whether a procedural violation has occurred.  *See, e.g.*, *Oceana*, 2005 WL 1847303, at *38 ("Congress' desire that fisheries be managed on a continuing basis cannot be read to eviscerate the legislature's equally strong desire that policy choices be determined with ample public participation . . . and its mandate that certain features of fisheries management regimes *must* be specified by FMP.") (emphasis in original) (citations omitted).

For these reasons, FSF's motion will be denied, but in order to avoid further confusion, the Court will amend its prior Memorandum Opinion to delete the two extraneous sentences relied upon by FSF.  A separate Order accompanies this Memorandum Opinion.

 

                                                                                     s/
                                                ELLEN SEGAL HUVELLE
                                                United States District Judge

Date:   October 6, 2005